No. 24-10834
CAPITAL CASE

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

**NICHOLAS CODY TATE,**
Appellant

v.

**SHAWN EMMONS, Warden,**
**Georgia Diagnostic & Classification Prison,**
Appellee.

_____

On Appeal from the United States District Court
for the Northern District of Georgia, No. 4:12-cv-00019-WMR

_____

**BRIEF OF APPELLANT**
**NICHOLAS CODY TATE**

_____

Emily Gilbert
Federal Defender Program, Inc.
101 Marietta Street, NW, Suite 1500
Atlanta, Georgia 30303
(t) 404-688-7530
Emily_Gilbert@fd.org

Counsel for Nicholas Cody Tate

No. 24-10834
Tate v. Warden

**CERTIFICATE OF INTERESTED PARTIES**

Pursuant to 11th Cir. R. 26.1-2(a), counsel certifies that the following have an interest in the outcome of this appeal:

Beavers, Hon. Tonny S., Paulding Judicial Circuit, trial judge

Burton, Beth A., counsel for Appellee

Carr, Christopher M., counsel for Appellee

Cella, Marc, trial counsel for Mr. Tate

Clark, Bill, former Paulding County Assistant District Attorney

Durham, Mitchell, motion for new trial and direct appeal counsel for Mr. Tate

Emmons, Shawn, Warden, Georgia Diagnostic Prison, Appellee

Ertel, Jeffrey L., former counsel for Mr. Tate

Gilbert, Emily, counsel for Mr. Tate

Graham, Sabrina D., counsel for Appellee

Irwin, Hon. David B., Rockdale Judicial Circuit, state habeas judge

Kammer, Brian S., state habeas counsel for Mr. Tate

Knox, Rusty, former Paulding County Assistant District Attorney

Lane, Fred A., former Paulding County District Attorney

Malcolm, Clint C., counsel for Appellee

Martin, John, counsel for Dustin Tate as "Next Friend" for Nicholas Tate

Osborne, James R., former Paulding County District Attorney

No. 24-10834
Tate v. Warden

## CERTIFICATE OF INTERESTED PARTIES

Ray, Hon. William M., United States District Court, federal habeas judge

Reed, Benjamin B., trial and direct appeal counsel for Mr. Tate

Reiner, Heidi, state habeas counsel for Mr. Tate

Silas, Natasha Perdew, Executive Director, Federal Defender Program, Inc.

Stork, Gretchen, former counsel for Mr. Tate

Tangum, Richard, former counsel for Appellee

Tate, Chad, co-defendant

Tate, Dustin, co-defendant

Tate, Nicholas Cody, Appellant

Volkodav, Anthony, former Paulding County Assistant District Attorney

Weinberger, Dana E., former counsel for Appellee

Williams, Chrissie (deceased), victim

Williams, Katelyn (deceased), victim

No publicly-traded company or corporation has an interest in the outcome of this case or of this appea

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Petitioner requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a), Eleventh Circuit Rule 28-1(c), and Eleventh Circuit Rule 22-4, Internal Operating Procedure 2.  This is a death penalty case in which the procedural history and law are complex and the factual record is extensive.  Counsel for Petitioner believes the oral argument would assist the Court in its resolution of his claims.

## TABLE OF CONTENTS

Certificate of Interested Parties ........................................................... C-1

Statement Regarding Oral Argument ...................................................... i

Table of Authorities ............................................................................ ix

Statement of Jurisdiction ..................................................................... 1

Statement of the Issues ........................................................................ 2

Statement of the Case .......................................................................... 3

    A.    Introduction ......................................................................... 3

        1.    Mistake of law ........................................................... 3

        2.    Mistake of fact ........................................................... 4

    B.    Course of Proceedings and Disposition Below .......................... 6

    C.    Statement of Relevant Facts ................................................... 7

        1.    Judge: Tragic "consequences [] never anticipated" ........... 7

        2.    Plea offers of life sentences for all three brothers .............. 10

        3.    Competency evaluation: acting under brother's
            direction .................................................................... 11

        4.    Everything "paled in significance" to sibling rape ........... 12

        5.    A lull in the proceedings and a transformative
            religious awakening .................................................... 13

        6.    Courthouse gossip that the judge was lenient, and a
            guilty plea deal without a negotiated sentence ................ 14

        7.    The bench trial and counsel's mitigation case ................ 16

8.    Four year delay and waiver of motion for new trial ........18

9.    The evidence before the state habeas court: Chronic abuse and neglect, substance abuse and suicide attempts; brain damage; and the predisposition to mental disease and defects ....................................................19

10.   The Georgia Supreme Court's treatment of Tate's ineffective assistance of counsel claim................................21

11.   Federal habeas proceedings ...................................................22

D.    Standard of Review ..........................................................................23

Summary of the Argument.......................................................................25

Argument and Citation of Authority.....................................................29

I.    Petitioner's Sixth, Eighth and Fourteenth Amendment Right to the Effective Assistance of Counsel at All Critical Stages and on Appeal was Denied ......................................................................................29

A.    Unreasonable failure to investigate and present abundant mitigating evidence of upbringing and mental illness...............31

1.    Overwhelming multi-generational mental illness............31

2.    Childhood of unrelenting trauma, cruelty and abuse......33

3.    Rape by brother at age 8 and sadistic abuse by mother's boyfriend...................................................................37

4.    Commitment to mental hospital at age 13 ........................40

5.    More sexual abuse, and incest between the siblings ........41

6.    Self-medication, suicide, crippling anxiety and cry for help ....................................................................................42

iii

7.    Unrefuted expert testimony: ................................................46

    a.    Chronic trauma with physiological changes to the brain ...............................................................46

    b.    Brain damage................................................................47

    c.    Trauma-induced substance abuse............................48

B.    No strategic reason for failing to investigate:  Counsel ignored red flags.................................................................49

    1.    Red flags in sexual abuse .......................................52

    2.    Red flags in competency report ...........................54

    3.    Red flags in mental health records ......................56

    4.    Red flags regarding brain damage .......................57

C.    The Georgia Supreme Court opinion is contrary to and an unreasonable application of *Strickland* and is based on an unreasonable determination of the facts.......................59

    1.    Defense counsel were prejudicially ineffective and the Georgia Supreme Court reversed the state habeas court by misapplying clearly established federal law and unreasonably determining facts unsupported in the record...................................59

        a.    The Georgia Supreme Court disregarded explicit legal distinctions: Nick did not instruct counsel not to present any mitigation and *Strickland*, not *Landrigan,* applies.......................................60

        b.    The Georgia Supreme Court's unreasonable application of *Landrigan* rests on a single, clearly erroneous sentence in the guilt portion of the

iv

habeas court decision, as emphasized by the district court. ...............................................................64

c.    The unreasonable application of *Landrigan* rests on a false conflation:  Client wanting the death penalty is not forbidding mitigation...........................................68

d.    Counsel's consistent testimony:  No instruction "ever" not to present mitigation and *Strickland*, not *Landrigan*, applies.........................................................72

e.    Post hoc complaints by petitioner and "somewhat unclear" statements by counsel four years after trial do not change the facts at trial...................................75

f.    The reason counsel's post-trial testimony was "somewhat unclear" and "at odds with other testimony and evidence" was because counsel did not investigate and did not know the extent of the mitigation...................................................................81

g.    "It's an overwhelming case in mitigation": Mitigation was presented and *Landrigan* does not apply ...........................................................................87

D.    The sentencing court never heard the overwhelming mitigation, and as properly found by the habeas court, petitioner was prejudiced under *Strickland*..................................90

E.    The state supreme court's "prejudice" analysis is an unreasonable application of clearly established federal law...................................................................................95

1.    Counsel did not know the vast majority of this evidence and so could not have discussed it with Nick .........................................................................97

v

a.  Counsel did not know about childhood abuse and trauma other than child sexual abuse by Curtis .....98

b.  Counsel did not know about and did not discuss "expert evidence of psychiatric background and mental disorders" like that presented in the habeas court ...........................................................................100

c.  Counsel did not have the same evidence explaining Nick's drug use and dependency as presented to the habeas court and so could not have discussed it with him ...................................................................102

II.  The Prosecution Violated Mr. Tate's Rights to Due Process and a Reliable Sentencing Under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by Advancing a Materially Misleading and Factually Insupportable Argument that Nick Tate Killed Katelyn Williams. Counsel Were Constitutionally Ineffective for Failing to Counter These Misleading Arguments at Trial and Raise Them on Appeal........................................................................104

A.  The prosecutor's presentation of inherently factually contradictory theories ..................................................105

1.  To secure Chad 's conviction for the murder of Katelyn the prosecutor relied on evidence and facts supported by consistent, credible accounts from all defendants ...........................................................................105

2.  At Nick's sentencing, the prosecutor adopted a diametrically opposite factual theory before a different judge in order to secure a death sentence ........106

3.  The prosecutor's theory of the case, up until the moment of Nick's sentencing, was that Chad alone killed Katelyn........................................................................107

vi

a.    Chad's guilty plea ...................................................107

b.    Dustin's guilty plea ..................................................109

B.    The prosecutor's use of inconsistent and incompatible
theories of culpability to secure a death sentence violated
Mr. Tate's right to due process .....................................110

C.    The state court's and the district court's analyses of cause
and prejudice to excuse procedural default were flawed
and relief is merited ........................................................113

1.    Trial counsel preserved Mr. Tate's due process
claim by filing the motion in limine ...................................113

2.    The state court based its analysis of appellate
counsel's performance on a flawed factual finding
and an incorrect standard of review on appeal ...............114

D.    The state court's finding that "the state never adopted as
its theory Chad's version of how Katelyn's murder
occurred" is based on an unreasonable determination of
the facts in light of the evidence ....................................116

E.    By any standard, petitioner suffered prejudice and de
novo review is proper .....................................................119

F.    Trial counsel was prejudicially deficient for failing to
meaningfully challenge the prosecutor's argument as
false and misleading or to articulate the illegality of such
argument under clearly established Supreme Court and
related precedent ...........................................................120

G.    The prohibition against cruel and unusual punishment
imposed by the United States Constitution protects Mr.
Tate from arbitrary, capricious, or mistaken
administration of the death penalty ............................122

III.   Counsel Were Prejudicially Ineffective for Misleading Nick into
       Waiving His Sixth Amendment Right to a Jury Trial .........................123

       A.   Counsel "outsmarted" Nick into waiving a jury.......................124

       B.   "Strategy" based on leniency rumors was unreasonable.........125

       C.   Counsel ignored their client's experience with the judge........126

       D.   Under the "unique circumstances" of this case, the waiver
            could not be "intelligent, competent and self-protecting".......128

Conclusion......................................................................................................130

Certificate of Compliance and Service............................................................131

## TABLE OF AUTHORITIES

### Federal Cases

*Abdul-Kabir v. Quarterman*,
550 U.S. 233 (2007) ........................................................................ 58

*Adams v. United States ex rel. McCann*,
317 U.S. 269 (1942) ..................................................... 123-124, 128

*Allen v. Sec'y*,
611 F.3d 740 (11th Cir. 2010) ................................................. 70, 80

*Andrew v. White*,
145 S.Ct. 75 (2025) ........................................................ 22, 27, 111

*Andrus v. Texas*,
590 U.S. 806 (2020) ............................................. 29, 49, 51, 58, 90

*Baxter v. Thomas*,
45 F.3d 1501 (11th Cir. 1995) ................................................. 91-92

*Blackledge v. Allison*,
431 U.S. 63 (1977) ..................................................................... 76

*Blystone v. Horn*,
664 F.3d 397 (3d Cir. 2011) ........................................ 62, 80, 87, 97

*Brady v. United States*,
397 U.S. 742 (1970) ................................................................... 129

*Brooks v. Kemp*,
762 F. 2d 1383 (11th Cir. 1985) ................................................. 115

*Brownlee v. Haley*,
306 F.3d 1043 (11th Cir. 2002) ............................................... 91-92

ix

*Brumfield v. Cain*,
    576 U.S. 305 (2015) ................................................................. 66, 118

*Calderon v. Thompson*,
    523 U.S. 538 (1998) ....................................................................... 112

*Caldwell v. Mississippi*,
    472 U.S. 320 (1985) ....................................................................... 111

*Cave v. Singletary*,
    971 F.2d 1513 (11th Cir. 1992) ..................................................... 125

*Coleman v. Mitchell*,
    268 F.3d 417 (6th Cir. 2001) ........................................................... 88

*Conner v. GDCP Warden*,
    784 F3d 752 (11th Cir. 2015) ...........................................................61

*Cooper v. Sec'y*,
    646 F.3d 1328 (11th Cir. 2011) ........................................... 5, 67, 93

*Cummings v Sec'y*,
    588 F.3d 1331 (11th Cir. 2009) ........................................ 69-71, 80

*Daniel v. Comm. Al. Dept. of Corr.*,
    822 F.3d 1248 (11th Cir. 2016) .................................................. 49, 55

*Darden v. Wainwright*,
    477 U.S. 168 (1986) ................................................. 111, 115, 119-120

*DeBruce v. Comm., Ala. Dept. Corr.*,
    758 F.3d 1263 (11th Cir. 2015) ................................................. 54, 95

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974) .......................................................................111

x

*Drake v. Kemp*,
762 F.2d 1449 (11th Cir. 1985) ........................................................... 112, 120

*Duest v. Singletary*,
997 F.2d 1336 (11th Cir. 1993) .................................................................. 105

*Duke v. United States*,
2021 WL 6339550 (U.S. Dist. Ct. N.D. Texas, 2021) ............................. 76, 79

*Duncan v. Louisiana*,
391 U.S. 145 (1968) ..................................................................................... 128

*Dunlop v. United States*,
165 U.S. 486 (1897) ..................................................................................... 111

*Evitts v. Lucey*,
469 U.S. 387 (1985) ....................................................................................... 29

*Ferrell v. Hall*,
640 F.3d 1199 (11th Cir. 2011) ................................................... 23, 49, 53, 92

*Fry v. Shoop*,
124 F.4th 1019 (6th Cir. 2025) ..................................................................... 89

*Gardner v. Florida*,
430 U.S. 349 (1977) ..................................................................................... 104

*Giglio v. United States*,
405 U.S. 150 (1972) .............................................................................. 119-120

*Gilreath v. Head*,
234 F.3d 547 (11th Cir. 2000) ....................................................................... 96

*Godinez v. Moran*,
509 U.S. 389 (1993) ..................................................................................... 129

xi

*Gray v. Branker,*
    529 F.3d 220 (4th Cir. 2008) ................................................................. 61, 96-97

*Green v. Georgia,*
    442 U.S. 95 (1979) ........................................................................................ 122

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ...................................................................................... 122

*Hamilton v. Ayers,*
    583 F.3d 1100 (9th Cir. 2009) ......................................................................... 62

*Hansbrough v. Latta,*
    11 F.3d 143 (11th Cir. 1994) ........................................................................... 24

*Harding v. United States,*
    2024 WL 490839 (11th Cir. 2024) .................................................................. 76

*Hardwick v. Fla. Dep't of Corr.,*
    803 F.3d 541 (11th Cir. 2015) ......................................................................... 54

*Harrington v. Richter,*
    562 U.S. 86 (2011) ........................................................................................... 67

*Jefferson v. GDCP Warden,*
    941 F.3d 452 (11th Cir. 2019) ......................................................................... 49

*Jefferson v. Sellers,*
    250 F.Supp.3d 1340 (N.D.Ga. 2017) .......................................................... 57-58

*Jefferson v. Upton,*
    130 S. Ct. 2217 (2010) .................................................................................... 57

*Johnson v. Dept. of Corr.,*
    643 F.3d 907 (11th Cir. 2011) .................................................................... 56, 91

xii

*Johnson v. Mississippi*,
    403 U.S. 212 (1971) ........................................................................ 105

*Johnson v. Mississippi*,
    486 U.S. 578 (1988) ................................................................ 24, 122

*Johnson v. Zerbst*,
    304 U.S. 458 (1938) ........................................................................ 128

*Krawczuk v. Sec'y*,
    873 F.3d 1273 (11th Cir. 2017) ................................. 22, 70, 80, 96

*Lang v. Cullen*,
    725 F.Supp.2d 925 (D.C. Cal. 2010) ................................. 70-71, 80

*Lee v. United States*,
    582 U.S. 357 (2017) .......................................................................... 76

*Lockett v. Ohio*,
    438 U.S. 586 (1978) .......................................................................... 98

*Loden v. McCarty*,
    778 F.3d 484 (5th Cir. 2015) ............................................. 70-71, 80

*McNair v. Campbell*,
    416 F.3d 1291 (11th Cir. 2005) ...................................................... 23

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) ........................................................................ 118

*Miller-El v. Dretke*,
    545 U.S. 231 (2005) .......................................................................... 66

*Napue v. People of State of Ill.*,
    360 U.S. 264 (1959) ........................................................................ 120

*Porter v. McCollum*,
    558 U.S. 30 (2009) .......................................... 2, 5, 23, 26, 61-63, 86, 90, 92, 96

*Rega v. Wetzel*,
    2018 WL 897126 (W.D. Pa., 2018) ................................................................. 89

*Rompilla v. Beard*
    545 U.S. 374 (2005) ................................... 2, 5, 26-27, 49-50, 60-64, 86, 90, 96

*Sanders v. Davis*,
    23 F.4th 966 (9th Cir. 2022) ........................................................................ 97

*Saranchak v. Sec'y, Penn. Dept. of Corr.*,
    802 F.3d 579 (3d Cir. 2015) ........................................................................ 54

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973) .................................................................................... 97

*Schriro v. Landrigan*,
    550 U.S. 465 (2007) ...................................................... 2-3, 21, 26, 59-60, 73-74

*Sears v. Upton*,
    561 U.S. 945 (2010) ............................................................................... 90, 94

*Sears v. Warden, GCDP*,
    73 F.4th 1269 (11th Cir. 2023) ................................................................... 118

*Skipper v. South Carolina*,
    476 U.S. 1 (1986) ........................................................................................ 98

*Smith v. Groose*,
    205 F.3d 1045 (8th Cir. 2000) ................................................................... 112

*Stankewitz v. Wong*,
    698 F.3d 1163 (9th Cir. 2012) ..................................................................... 88

*Strickland v. Washington*,
466 U.S. 668 (1984) ..... 2-4, 22-24, 26-27, 29, 49, 59-60, 68, 72, 74, 90, 94-96, 115

*Summerlin v. Stewart*,
341 F.3d 1082 (9th Cir. 2003) ........................................................ 128

*Tate v. Ford*,
141 S.Ct. 139 (Mem) ........................................................ 7

*Tate v. Georgia*,
562 U.S. 1180 (2011) ........................................................ 6

*Taylor v. Horn*,
504 F.3d 416 (3d. Cir. 2007) ........................................................ 71

*Thomas v. Horn*,
570 F.3d 105 (3d. Cir. 2009) ........................................................62

*Thompson v. Calderon*,
120 F.3d 1045 (9th Cir. 1997) (en banc) .................................... 112

*Turner v. Murray*,
476 U.S. 28 (1986) ........................................................ 123

*United States v. Bagley*,
473 U.S. 667 (1985) ........................................................ 120

*United States v. Hill*,
643 F.3d 807 (11th Cir. 2011) ........................................................ 112

*United States v. Lumpaziante*,
251 F.3d 519 (5th Cir. 2001) ........................................................ 76

*United States v. Shamsid-Deen*,
61 F.4th 935 (11th Cir. 2023) ........................................................ 124

*United States v. Spiegel,*
  604 F.2d 961 (5th Cir. 1979) .......................................................... 124

*Vergara v. State,*
  657 S.E.2d 863 (Ga. 2008) ............................................................ 113

*Waidla v. Davis,*
  68 F.4th 575 (9th Cir. 2023) ........................................................... 59

*Walker v. Davis,*
  840 F.2d 834 (11th Cir. 1988) ....................................................... 115

*Wiggins v. Smith,*
  539 U.S. 510 (2003) .................................. 25, 27, 29, 49, 53, 58, 61, 66, 91, 129

*Williams v. Allen,*
  542 F.3d 1326 (11th Cir. 2008) ................................................. 50, 54

*Williams v. Taylor,*
  529 U.S. 362 (2000) ...................................... 25, 29-30, 58, 91, 95-96

*Wilson v. Sellers,*
  548 U.S. 122 (2018) ....................................................................... 23

*Woodson v. North Carolina,*
  428 U.S. 280 (1976) ..................................................................... 104

*Young v. Sirmons,*
  551 F.3d 942 (10th Cir. 2008) ......................................................... 85

**State Cases**

*Carruthers v. State,*
  528 S.E.2d 217 (Ga. 2000) ........................................... 113, 115, 120

*Ford v. Tate*,
    835 S.E.2d 198 (Ga. 2019) .................................................. 3, 7, 21-22, 116-117

*Jefferson v. Sellers*,
    250 F.Supp.3d 1340 (N.D.Ga. 2017) .............................................. 57

*Tate v. State*,
    695 S.E.2d 591 (Ga. 2010) .............................................. 6

*Tollette v. State*,
    621 S.E.2d 742 (Ga. 2005) .............................................. 113

**Statutes & Rules**

28 U.S.C. § 2254 ...1-2, 7, 22-23, 27, 59, 64, 66-67, 80, 90, 97, 100, 104, 115, 118-119, 123, 130

28 U.S.C. § 1291................................................................ 1

28 U.S.C. § 2253................................................................ 1

Eleventh Circuit Rule 22-4 .................................................. i

Eleventh Circuit Rule 28-1 .................................................. i

Fed. R. App. P 34 .................................................. i

O.C.G.A. § 9-14-52 .................................................. 7

## STATEMENT OF JURISDICTION

This is an appeal from the final decision of the United States District Court for the Northern District of Georgia, Rome Division, denying Petitioner-Appellant a writ of habeas corpus. The district court had jurisdiction over the petition pursuant to 28 U.S.C. § 2254.

Appellate jurisdiction is proper under 28 U.S.C. §§ 1291, 2253. The district court granted Appellant a Certificate of Appealability.

## STATEMENT OF THE ISSUES

Whether the Georgia Supreme Court's opinion reversing the state habeas court's reasoned grant of relief based on sentencing counsel's prejudicial ineffectiveness under *Strickland v. Washington*, 466 U.S. 668 (1984):

> was contrary to or involved an unreasonable application of clearly established Supreme Court law, *see Porter v. McCollum*, 558 U.S. 30, 39 (2009) and *Rompilla v. Beard* 545 U.S. 374 (2005);

> unreasonably misapplied *Schriro v. Landrigan,* 550 U.S. 465 (2007).

Whether the district court, by applying *Landrigan,* failed to identify the correct legal analysis under *Strickland*.   *See* 28 U.S.C. § 2254(d)(1) and (d)(2).

Whether Petitioner's due process and Eighth Amendment rights were violated when the prosecutor, who admitted that the only thing that "makes this a death penalty case" was Katelyn Williams' death,  argued at at Nick Tate's sentencing that Nick Tate and not Chad Tate had actually killed Katelyn even though Chad Tate had confessed and pleaded guilty to being the killer and the prosecutor had vouched for that theory of culpability at Chad Tate's guilty plea.

Whether it was prejudicially deficient performance under *Strickland* for counsel to talk their mentally ill client into waiving a jury trial based on a belief the trial court would sentence him to life imprisonment and without assurances the court would not sentence him to death.

2

## STATEMENT OF THE CASE

### A.    Introduction

The state habeas corpus court found that trial counsel failed to investigate and present a prodigious amount of compelling, persuasive and available mitigating evidence, applied *Strickland,* and granted penalty phase relief.  On appeal, the Georgia Supreme Court quoted the habeas court's findings and disputed none of them: "[Tate]'s childhood was characterized by poverty, neglect, incest, and physical, sexual and emotional abuse," *Ford v. Tate,* 835 S.E.2d 198, 217 (Ga. 2019).  "[E]xtensive histories of mental disorders" were documented on both sides of Mr. Tate's family, "including anxiety, depression, drug dependency, bipolar disorder, and schizophrenia."  *Id*. at 219.  Mr. Tate's own mental illness included complex PTSD, "an especially severe form of PTSD" caused by repeated trauma.  *Id*. at 220.  He suffered from significant brain damage, and chronic drug use caused by his traumatic childhood which exacerbated his underlying organic brain deficits and made it "unlikely that the situation would have occurred without the substance abuse."  *Tate* at 220.

Pushing all of that powerful mitigating evidence to the side, the Georgia Supreme Court reversed, while making two glaring errors.

### 1.    Mistake of law

The first was the court's misapplication of *Schriro v. Landrigan,* 550 U.S. 465 (2007).  Instead of properly reviewing the habeas court's prejudice finding pursuant to *Strickland*, the state supreme court unreasonably

3

applied *Landrigan*, which holds that a defendant who refuses to allow the presentation of any mitigating evidence cannot show prejudice under *Strickland*. The Georgia Supreme Court concluded that Petitioner had directed counsel not to present any mitigating evidence, and therefore could not show prejudice from counsel's failure to do so.

### 2.    Mistake of fact

Second, the state supreme court credited, as a "factfinding," a sentence errantly copied from the Respondent's proposed order into the section of the habeas court's order denying guilt phase claims. That sentence wrongly stated Nick Tate had not wanted mitigation presented. Respondent's counsel admitted at oral argument in the Georgia Supreme Court that this "finding" was inadvertent and a mistake. Asked about the dichotomy between it and the remainder of the habeas court order, counsel for Respondent stated "Honestly why that happened? I think [the habeas judge] just mismatched two proposed orders and they don't necessarily go together." (Oral argument, *Ford v. Tate*, S19A0825, at time stamp 7:12-7:19). As the district court found, "Respondent has admitted that the language did not belong in the draft order." D.118:20.[1]

_____

[1]              "[C]ounsel mistakenly filed a pretrial motion that had language from another case that the defendant wanted to waive the presentation of mitigating evidence. [See Doc. 105 at 103]. Once trial counsel discovered the error, he withdrew the motion.

The Georgia Supreme Court relied on this clearly erroneous sentence, and on Petitioner's repeated assertions to the trial court that he deserved the death penalty, as showing a directive not to present mitigation evidence. *Tate* at 209, 216, 224.  The evidence before the habeas court, however, was that Nick Tate asked only that his older brother, who had raped him in childhood, and his mother, not be presented.  He did not curtail the presentation of anything else, as supported by the record and as reflected in the habeas court's penalty phase factfindings and ultimate conclusion.

This Court is not bound to defer to "unreasonably found facts or to the legal conclusions that flow from them."  *Cooper v. Sec'y*, 646 F.3d 1328, 1353 (11th Cir. 2011).  Petitioner's case is analogous to *Porter v. McCollum*, 558 U.S. 30, 40 (2009)(per curiam) where the defendant would not allow the testimony of two witnesses but did not curtail all mitigation, and *Rompilla v. Beard*, 545 U.S. 374, 381 (2005), where the defendant was "actively obstructive" and refused to assist with developing mitigation, but did not inform the court or counsel to not present any.  The state supreme court did not properly distinguish clearly established Supreme Court law

---

> Nonetheless, discussion from that motion made its way into the state habeas corpus court's opinion, having been pasted there from a draft order prepared by Respondent..."

D.118:20

5

differentiating the facts in Petitioner's situation from that in *Landrigan*, and that misapplication of *Landrigan* is the crux of this case.

## B.    Course of Proceedings and Disposition Below

Nick and his two brothers were arrested and charged with the 2001 killings of Chrissie and Katelyn Williams in Paulding County.[2]   Nick's two brothers pleaded guilty in 2002 in exchange for life sentences with the possibility of parole.  Nick pleaded guilty in 2005 without a negotiated deal and was sentenced to death following a bench trial.

Nick waived a motion for new trial.  A direct appeal was filed and denied.  *Tate v. State*, 695 S.E.2d 591 (Ga. 2010).   A petition for writ of certiorari was denied.  *Tate v. Georgia*, 562 U.S. 1180 (2011).

On January 11, 2012, a warrant was signed scheduling Nick's execution for January 31, 2012.  Nick filed a petition for writ of habeas corpus in the United States District Court for the Northern District of Georgia on January 18, 2012, through his brother Dustin as next friend.[3] He filed a state habeas petition and his execution was stayed.  The federal case was held in abeyance pending the exhaustion of Nick's claims in state court.

---

[2]    Because "Tate" is the surname of the co-defendants and many witnesses,  the brothers are referred to by their first names throughout this brief.

[3]    Petitioner later appeared on his own behalf and was substituted for his brother as a party.

6

In state habeas corpus proceedings, new counsel presented, *inter alia*, claims that counsel provided ineffective assistance.  The state habeas corpus court held an evidentiary hearing and considered and credited extensive evidence. On December 27, 2018, the state habeas court granted penalty phase relief.  D.96-001.  On January 25, 2019, Respondent filed a notice for automatic appeal pursuant to O.C.G.A. § 9-14-52(c).  Without disputing any of the evidence introduced in the state habeas proceedings, and without considering counsel's performance, the Georgia Supreme Court reversed.  *Ford v. Tate*, 835 S.E.2d 198 (Ga. 2019).  A petition for certiorari was denied.  *Tate v. Ford*, 141 S.Ct. 139 (Mem).

On September 16, 2021, Nick amended his petition for federal habeas corpus relief under 28 U.S.C. § 2254. D.50.  Without an evidentiary hearing, the district court denied relief on November 20, 2023, and granted a Certificate of Appealability as to four claims.  D.118.  Nick filed a Notice of Appeal to this Court on March 14, 2024, D.122, and moved to expand the Certificate of Appealability. D.12.  This Court denied that motion on August 1, 2024, and denied reconsideration of the motion on October 28, 2024.

## C.    Statement of Relevant Facts

### 1.    Judge: Tragic "consequences [] never anticipated"

Nick Tate was 21 years old, his brother Dustin was 19, and their younger brother Chad was 15 when they were arrested for the murders of Chrissie Williams and her daughter Katelyn, who was three years old.

7

Chrissie was married to Barry Williams, from whom the Tates purchased drugs. On the morning of December 11, 2001, the Tates "had done a considerable amount of drugs," D.74-37:83,[4] including methamphetamine. D.74-37:139. According to the prosecutor at Nick's guilty plea, the evidence showed that the brothers "were going to leave town for a while," D.74-36:199, and decided to stop at the home of Barry Williams and steal money and/or drugs. "Dustin Tate also formulated the desire and plan to rape Chrissie Williams… ." *Id*. They had weapons and purchased duct tape, a knife and ammunition on the way.

They believed that Chrissie would be the only one home since the Williams' children had been removed from the home by child protective authorities. When the brothers arrived at the Williams' house however, they found the children there for a visit.[5]

Chrissie was asleep in a bedroom. Dustin tried to render her unconscious with a taser, but succeeded only in waking her, whereupon he took her to another bedroom and tied her up. Nick and Chad began searching the house for drugs. D.77-37:106-107. Katelyn began running around the room. They put tape on her mouth but feared she could not breathe properly so Nick removed it. D.74-37:87. When she cried, Nick

---

[4]     District Attorney at Chad's guilty plea in 2002.

[5]     In addition to Katelyn, there was a baby, Brian. He was unharmed.

told Chad to take her to the bedroom to "try to tell her to be quiet." D.74-37:137; D.74-37:89. When she did not, Chad became angry and strangled her with a piece of phone cord, D.74-37:137, 143, until he thought she was dead. D.74-37:138. After he returned to the front room he heard her again. He then took Nick's knife, went back to the bedroom, and cut her throat. *Id*. at 138, 144.

All three co-defendants described Katelyn's killing as unplanned and done solely by 15-year-old Chad.[6] Nick discovered that Chad had killed Katelyn after the fact, D.74-37:110, 28-29, and was "terrified and...panicked." *Id*. Dustin left the house and Nick and Chad went into the bedroom where Chrissie was struggling on the bed. Nick put a pillow over her head and when she knocked it off, he pushed it down with the hand holding the gun. He and Chad each later said the gun went off accidentally, killing her. D.74-37:152, 225.

The brothers fled and their truck broke down in Mississippi the following day. The three asked for a battery jump from a gas station employee, Angie Rowzee, and then stole her jeep, taking her with them. That night they stopped at a motel and Nick rented two rooms. He stayed in one with Ms. Rowzee in order to keep her safely away from his brothers, whom he feared might try to assault her. D.74-37:243-244. The following day they released her unharmed. They turned themselves in in Oklahoma.

---

[6]    *See, e.g.* D.74-37:175.

9

Attorney Jimmy Berry was contacted by the brothers' father. He requested that the authorities call him before speaking to any of the brothers but this request was ignored. Both Nick and Dustin were questioned and confessed to their respective roles in the crimes.[7] In Nick's extensive taped confession, he told police that going to the Williams' home was Dustin's idea and that he felt compelled to act at Dustin's direction. D.74-37:206. He also told police he had been sexually abused as a child by an older brother, Curtis, and that Curtis was sent to prison for that abuse. D.74-37:257.

### 2.    Plea offers of life sentences for all three brothers

The brothers were returned to Georgia on December 15, 2001. On February 18, 2002, jail personnel took Nick to Three Rivers, a regional mental health agency, for psychiatric symptoms, including hearing voices. D.74-35:62. A psychiatrist recommended comprehensive testing by a neuropsychologist. D.74-35:63. On February 22, 2002, Marc Cella, from Cobb County, was appointed to represent Nick.

The prosecutor offered similar deals to each of the brothers. D.79-4:13-18. Nick was offered a life sentence but turned it down because his mother told him not to take it. D.74-34:211. Dustin and Chad each pleaded guilty in November 2002 in exchange for life sentences with parole

---

[7]    Chad, age 15, was permitted to call his parents and as a result did not speak with police.

eligibility.  The prosecutor told the Court at Chad's plea there was no evidence that Katelyn had been sexually molested, but he was charging child molestation because she was found without her pajamas.[8]  D.74-37:89.  He was permitted to enter an Alford plea to child molestation and also to the malice murder of Chrissie, having maintained from the beginning that Chrissie's shooting was an accident.  Chad took full and sole responsibility for killing Katelyn.  The Court's colloquy with Dustin made clear the court believed the way the crimes occurred was unplanned and unintentionally escalated.  D.74-36:299.[9]

### 3.    Competency evaluation: acting under brother's direction

Plea efforts for Nick continued and a court-ordered competency evaluation was performed in February of 2003 by Dr. Kevin Richards.  Dr. Richards was concerned that Nick valued his mother's legal advice more than his attorney's and returned for a second time in March.  D.74-34:211.  Dr. Richards learned that Nick's older brother Curtis had been imprisoned

---

[8]    The prosecutor admitted the same at Nick's trial. D.64-12:79.  Chad's testimony was that in the process of chasing her, she had wriggled out of her one-piece pajama suit.

[9]    At Dustin's guilty plea proceeding, Judge Foster questioned whether the crimes would have occurred if the brothers had not been using drugs that day, concluding "oftimes we make bad choices and we start things in action, and consequences that we never anticipated result, and I think that was the situation here."  D.74-36:297, 299.

11

for sexually molesting him, D.74-36:135, and that Nick had been treated at the local mental health clinic and at Northwest Georgia Regional Hospital ("NGRH").

As noted by the state habeas court, Dr. Richards found that Nick "suffered from 'diagnosable mental conditions at the time of the alleged offense,' which 'would certainly have influenced his behavior greatly and affected his judgment significantly at and around the time of the alleged offenses.'" D.96-1:39-40. He also noted several suicide attempts, a substance abuse issue, and an anxiety disorder. Dr. Richards testified below that it "was clear that he was acting at the time of the offense under the direction of his brother Dustin." D.74-34:211. Nick told Cella similar information in 2003. D.74-32:70-71, D.79-4:111-113.

In July of 2003, Benjamin Reed was appointed as second chair. He was not from Paulding County, had never worked on a death penalty case and was not death-qualified.

### 4. Everything "paled in significance" to sibling rape

Counsel found the information that Nick had been raped as a child by Curtis to be overwhelmingly mitigating and zeroed in on this. D.81-1:28. "Everything else paled in significance." D.74-32:71.

At an *ex parte* hearing in June of 2004, Cella declined funds for a mitigation investigator, saying he was close to being ready for trial and would be ready without one, but if that changed, he would come back to

12

the court prior to trial.  D.79-5:10-14, 34.[10]    Cella likewise made a
"qualified" request for a defense psychologist.  He noted Dr. Richard's
report about substance abuse and the "pathological relationship" with
Dustin, but he was unsure if Dr. Richards was qualified to address "how
substance abuse affects one's brain and therefore, one's judgment." D.79-
5:14.   The court agreed to hold the motion for a psychologist and a related
one for a pharmacologist until counsel could explore Dr. Richards's
qualifications in this regard. D.83-3:2.  Six weeks later, in August 2004, the
judge retired.

### 5.    A lull in the proceedings and a transformative religious awakening

When court reconvened in September of 2005, counsel told newly-
assigned judge Tonny Beavers, that "there ha[d]n't been much going on
with th[e] case" and there were only "a few hours that [he'd] worked on
the case since … a year and a half ago."  D.61-8:4. Judge Beavers signed the
State's Order setting trial for approximately 6 weeks later, October 24, 2005.

Counsel found that "[w]hen the case proceedings picked up again,
Nick had become religious.  He felt like he should plead guilty to the crime
without a deal because he was guilty, and open himself up to the death

---

[10]    There was never a mitigation investigator or investigation.

13

penalty." D.74-35:33. *See also* D.81-1:30.[11] Counsel's billing records show he had still not performed any substantive investigation. D.79-4:44-46.

### 6. Courthouse gossip that the judge was lenient, and a guilty plea deal without a negotiated sentence

Dr. Richards again evaluated Nick, this time for competency to plead guilty. At a September 9, 2005 hearing, six weeks before trial, counsel reported that competency was not an issue.[12]

Cella revisited his outstanding *ex parte* funds motions. He again told the Court he *might* be asking for funds for a psychologist and a pharmacologist. He was still considering using Dr. Richards in this capacity but was "having second thoughts about that." D.61-8:33. Cella also told the court that plea discussions were ongoing. D.61-8:36.

---

[11]   Nick was functionally illiterate at the time of his arrest but learned to read during his years in jail with the help of the volunteer chaplain, Cyril Watnes. D.64-12:44-47. Watnes read the Bible with Nick and brought him copies of the "Bible Believers Bulletin," a monthly publication from a fiery pastor who preached strong support for the death penalty. *See* D.80-1:2.

[12]   In his September 27, 2005 report, Dr. Richards found that Nick's now "fervent" religious views were "strident," but did not cross a line to being delusional, and found him competent. D.74-36:139-142. He did not know about the contentious religious figure Nick was following.

14

No plea deal was reached.  Voir dire started October 24.  Nick told counsel he did not want counsel to "talk about" the rapes by Curtis.[13] D.72-32:72, D.74-35:35.  He also did not want his mother to testify because he did not want her subject to the district attorney's cross-examination. D.74-35:35.   These were the only two persons or things Nick asked counsel not to present.  D.81-1:58.

Following nearly three weeks of voir dire, on November 15, 2005, Nick pleaded guilty to all counts, including child molestation, a charge he had previously vehemently denied and for which the State admittedly had no evidence and had at one point offered to dismiss.  D.64-12:79.

 He also pled to the deliberate killing of Chrissie, something he had steadfastly maintained was an accident.  During the plea colloquy, Nick told the court that he had killed Chrissie at Dustin's order, and that his relationship with Dustin went "beyond anything of a brother to brother relationship…anything that pleased him, it didn't matter what it was, I'd do it, no questions asked."  D.74-36:209-210.  He admitted to using profuse amounts of drugs but denied this had affected his knowledge of right from wrong.  D.74-36:217-18.  He was pleading guilty because he believed he

---

[13]    According to Reed's paralegal Rachele McKenzie, Nick "was afraid of what would happen to Curtis if this was brought up again."  D.74-35:39.

should "accept what's coming to [him], whatever it might be."  D.74-36:210.

At the colloquy, Cella announced that Nick intended to waive his right to a sentencing jury.  In the habeas proceedings, counsel testified that he heard around the courthouse that the judge was lenient, D.81-1:51.  He intentionally misled Tate into believing the judge was more likely than a jury to give the death penalty, while Cella actually believed the opposite was true.  D.74-32:104.  According to Reed, counsel "were convinced [the judge] would return a life sentence."  D.74-35:36.  The remaining jurors were dismissed.

### 7.    The bench trial and counsel's mitigation case

On November 28, the sentencing trial began.  D.64-8.  As found by the habeas court,

> the State presented 22 witnesses over four days, including witnesses to the Tate brothers' whereabouts the morning of the crime, police officers, crime scene technicians, GBI agents, five members of the victims' family and the carjacking victim from Mississippi.

D.96-1:31.

Counsel presented two witnesses in mitigation:  Nick's father, Oswald Tate, and Cyril Watnes, the volunteer jail chaplain.

Watnes testified that he had visited Nick for three and a half years.  D.64-12:47.  Nick had asked "questions pertaining to the Bible" and right and wrong, with the "idea of accepting responsibility."  *Id.* at 49-50.

16

Oswald Tate's direct testimony took up just over one transcript page. He stated that he had taught his children to admit when they were wrong and because all three had been involved they should all get the same life sentence. D.64-12:64.

The prosecutor argued in closing that the case would not be a death penalty case but for the killing of the child. D.64-12:77-78. He then argued, contrary to the record evidence, that it was Nick, and not Chad, who had killed the child. D.64-12:84-85. Counsel did not object, although he had filed a motion in limine in 2004 to prevent exactly this argument, which had been denied.

In his own closing, defense counsel told the court that Nick was taking responsibility for his actions, D.64-12:100, but was not asking the court to give him the death penalty. "That's not what his statement to you was. He said he deserved the death penalty for what he did. He did not say 'I want the death penalty.'" D.64-12:101. He reminded the court that Nick had accepted responsibility despite Dustin's controlling influence over him, and his statement that his drug use was not relevant to the crime because he knew right from wrong. *Id.* at 103. He argued there was no one more remorseful, that Nick was not the leader, and that Chad had killed the child so it was therefore a "stretch" for Nick to receive death when the brothers got life sentences. D.64-12:108.

Counsel then gave the trial court an array of "mitigating factors which favor the life sentences." D.64-12:109. *See also* D.85-5:31. These

17

included that Nick had been a model inmate and would not be a future danger, D.64-12:114-15, and the testimony of carjacking victim Angie Rowzee that Nick had protected her from his brothers. *Id*. at 117-119.

Counsel submitted the 1990 indictment and conviction of Nick's brother Curtis for molesting Nick into evidence as an exhibit, but did not refer to it. He also submitted some greeting cards Nick's mother had sent him in jail. D.66-3:282-308.

Judge Beavers sentenced Nick to death on December 19, 2005.

### 8.    Four year delay and waiver of motion for new trial

There was no movement on the case for four years.  A standard motion for new trial was filed, but six months later Cella left the case to become a prosecutor in Cobb County.  New lead counsel Mitch Durham was not appointed until September 2007 and did not contact Nick until February of 2008.  He met with him once. Nick wrote the trial court several times asking that new counsel be appointed.  D.59-1:172, 177, 184.  Finally, at a status hearing in June 2009, Nick stated he wanted to fire Durham and Reed, whom he termed incompetent.  He then announced that he did not want to proceed with his motion for new trial.  D.74-36:232.  He also stated

18

that he would have waived mitigation at his trial if he had known he could. *Id.* at 234-35.[14]

The trial court did not appoint new counsel, and Durham filed the 2010 direct appeal.  He did not raise any claims based on the prosecutor's closing argument.

### 9. The evidence before the state habeas court: Chronic abuse and neglect, substance abuse and suicide attempts; brain damage; and the predisposition to mental disease and defects

Nick's repeated rape by an older sibling was only one aspect of a nightmarish childhood.  Every adult in the Tate family failed to protect the Tate children and most were active predators.  Nick's mother abused the children herself and allowed her boyfriend to victimize them. They suffered fiendishly cruel physical abuse, demeaning and excoriating verbal abuse, force-feeding, and rampant incest.

The habeas court was presented with many witnesses who would have testified on Nick's behalf at trial.  D.74-34:223-294; D.74-35:2-25.  None had been contacted by trial counsel.

Numerous mental health professionals reported that Nick suffers from complex post-traumatic stress disorder from the unremitting childhood trauma and abuse.  Neuropsychological testing of the type

---

[14] This motion for new trial status conference in 2009 was the only time Nick ever addressed the issue of mitigation.  His comment makes clear he did not waive mitigation at the 2005 trial.

recommended before trial showed brain damage. And expert testimony before the state habeas court linked Nick's longstanding substance abuse to the overt, extreme trauma of his young life and a three-generation history of major mental illness in his family.

Prison and hospital records that counsel never obtained showed Nick sought psychological help the year before the crimes. Records showed repeated suicide attempts that counsel never investigated. Medical records spanning a decade showed Nick's mother suffered psychiatric illnesses throughout his upbringing and was heavily medicated. A counselor who saw her during that time testified to her pathology and drug dependence. D.74-32:53. Sheriff's deputies would have testified to his exemplary behavior and their belief he posed no future danger if incarcerated for life. D.74-35:26-29.

All of this mitigation was credited by the state habeas court, which found that "[a]lthough Petitioner might have expressed that he did not want evidence regarding his molestation by Curtis to be brought out in court, trial counsel's failure to present any of the extensive evidence of Petitioner's family life was unreasonable and Petitioner suffered resulting prejudice." D.96-1:53-54.

The state habeas court denied guilt phase relief. In the "guilt-innocence phase performance" section of its order, the habeas court mistakenly inserted verbatim language from Respondent's proposed order, writing that "following trial counsel's attempts to negotiate a plea,

20

Petitioner expressed a desire to plead guilty, did not want trial counsel to present mitigation evidence, and wanted to receive the death penalty. (MHT, 4/9/04, pp 31-32)."[15] The inclusion of this language in the habeas court's final order, completely at odds with the court's penalty phase factfindings and conclusions, was a mistake by the habeas court, as acknowledged by Respondent.[16]

### 10.    The Georgia Supreme Court's treatment of Tate's ineffective assistance of counsel claim

The Georgia Supreme Court reviewed the grant of relief by the state habeas corpus judge and reversed.  It seized on the sentence from the aforementioned motion that Nick "did not want counsel to present mitigation."  Ignoring the habeas court's finding that the only mitigation witnesses Nick asked counsel not to present were his brother Curtis and his mother, the court applied the reasoning of *Schriro v. Landrigan,* 550 U.S. 465 (2007), which addresses a situation where a defendant forbids the presentation of *any* mitigation evidence.  According to the court, "a defendant who refuse[s] to allow the presentation of any mitigating evidence [can]not establish *Strickland* prejudice based on his counsel's failure to investigate [and present] further possible mitigating evidence." *Ford v. Tate*, 835 S.E.2d 198, 214, (Ga. 2019), *citing Landrigan* at 478 and

---

[15]    *See* n.1, *supra*.

[16]    *See* n.1, *supra*.

adding brackets.  The state court did not rule on counsel's performance.  *Id.* at 238 n.15.

The court also found that while *Landrigan* does not require a defendant to make a knowing and informed waiver of mitigation, if a knowing and intelligent waiver *were* required, trial counsel were actually "aware of the vast majority" of the mitigation evidence presented in habeas proceedings and had discussed using it with Nick.  Because he could not show that if he was "advised more fully [he] would have authorized [presenting] such evidence" he could not then make the *Strickland* prejudice showing that the new evidence would have in reasonable probability changed the verdict.[17]

### 11.  Federal habeas proceedings

The district court affirmed the state supreme court opinion pursuant to § 2254, despite finding that the record was "susceptible to differing interpretations."  D. 118:28.  It did not defer to, or even discuss, the habeas court's factfindings regarding counsel's performance, and did not question the state court's application of *Landrigan* to the record facts. *See Andrew v. White*, 604 U.S. __, 145 S.Ct. 75, 82-83 (2025)(before deferring to a state court's "application of" Supreme Court precedent a federal court has an independent obligation to "first identify the relevant 'clearly established

---

[17]    *See Tate* at 215, citing *Krawczuk v. Sec'y*, 873 F.3d 1273 (11th Cir. 2017).

Federal law.'") The district court also discounted Cella's testimony that Nick never forbade counsel from presenting mitigation. D.118:27.

Because under *Landrigan* a defendant who forbids mitigation cannot show prejudice, the district court did not review what it termed the state supreme court's "alternative rationales denying relief or the mitigation case that trial counsel could have presented," *i.e.,* the protracted discussion asserting that counsel discussed all of the available mitigating evidence with Nick and Nick had refused to allow it.

## D.    Standard of Review

If this Court finds that the state court addressed the merits of a federal constitutional claim in a manner that is contrary to or an unreasonable application of clearly established Supreme Court law, did not address the merits at all, or unreasonably determined the facts, then *de novo* review of Petitioner's arguments is required. *Ferrell v. Hall*, 640 F.3d 1199, 1224 (11th Cir. 2011). An ineffective assistance of counsel claim is a mixed question of fact and law that is subject to *de novo* review. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).

When considering a *Strickland* claim, a federal court reviews the "last reasoned" state-court decision that addressed that claim. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). If a state court decides only part of a federal claim (e.g. only the prejudice component of an ineffective-assistance claim), then only the part ruled on is assessed under § 2254(d). *See Porter*, 558 U.S. 30, 39 (2009)(per curiam). For Petitioner's claim of ineffective assistance for

23

failure to investigate and present mitigation, the last reasoned decision for each *Strickland* prong was made by a different court. The state habeas corpus court found constitutionally deficient performance resulting in prejudice to Mr. Tate.

The Georgia Supreme Court reversed the habeas court's prejudice finding, but expressly did not address the performance prong. The state habeas court's is the last reasoned decision on counsel's performance.

The Georgia Supreme Court found Petitioner's prosecutorial misconduct claims were barred by procedural default. The question of whether the state court procedural rule is adequate to bar federal review of the claim and the question of whether cause and prejudice exist sufficient to overcome the bar are reviewed *de novo*. *Hansbrough v. Latta*, 11 F.3d 143, 145 (11th Cir. 1994); *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988).

## SUMMARY OF THE ARGUMENT

Argument I:

The circumstances of this case and its treatment by the state supreme court are highly unusual.  Counsel here knew from the beginning of their representation in 2003 – directly from their client -- that Nick had a mitigated history, including suicide attempts, committal to a mental health institution at age 13, more psychiatric interventions close to the time of the crime, extreme drug use, and rape as a child by his brother.

Despite this knowledge, defense counsel did virtually no investigation for two and a half years, not gathering records, while they held various plea discussions and relied on their mistaken belief that the childhood rape by his brother was such overwhelming mitigation that nothing else could compare. D.74-32:71. Counsel did not hire a mitigation investigator. D.74-32:92-93. At trial, counsel relied on information he heard around the courthouse that a substitute judge was unlikely to impose a death sentence. They still had not investigated mitigation.

The result was that the sentencing court did not hear the evidence the habeas court found would have, in reasonable probability, resulted in a life sentence.   D.96-1:28-54.  The mitigation credited by the habeas court here is the same scope as that found to be overwhelmingly mitigating in *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins v. Smith*, 539 U.S. 510 (2003): extraordinary childhood abuse and neglect, so pervasive and uniquely cruel that *every expert* consulted on this case, for both parties, agreed it was

25

the worst they had ever heard; plus significant brain damage, mental illness, and trauma-induced substance abuse.  The habeas court found this evidence to be compelling and available, and that counsel were prejudicially deficient for failing to discover and present it.

Instead of properly reviewing the habeas court's prejudice finding pursuant to *Strickland*, the Georgia Supreme Court unreasonably applied *Schriro v. Landrigan*, 550 U.S. 465 (2007) and reversed

The state supreme court concluded that *Landrigan* governed on the basis of a clearly erroneous "factfinding." The court relied on a reference to extra-record evidence *from another case* that stated "the defendant" did not want mitigation presented.  It construed that, and Nick's statements that he deserved the death penalty, as directives not to present mitigation evidence.   Applying *Landrigan,* the court concluded that Nick had instructed counsel not to present *any* mitigation, so there could be no prejudice. *Tate* at 209, 216, 224.  It ignored the overwhelming evidence relied on by the habeas court that Nick told his counsel only that he did not want his brother Curtis or his mother to testify.   That evidence proved his case to be foursquare with *Porter v. McCollum*, 558 U.S. at 40 (failure to investigate unreasonable under *Strickland* where defendant instructed counsel not to speak with two witnesses but did not give any other instructions limiting the witnesses counsel could interview).  *See also Rompilla*, 545 U.S. at 381 (even a defendant who was "uninterested in

26

helping" and "actively obstructive" did not excuse counsel's obligation to perform a reasonable investigation).

The state supreme court did not correctly identify this clearly established Supreme Court law.

The district court, in turn, failed to identify the correct clearly established Supreme Court precedent before deferring to the state court's holding, contrary to 28 U.S.C. §2254(d)(1). *See Andrew*, 145 S.Ct. at 82-83.

The clearly established federal law governing Nick's claims is *Strickland* and its progeny, *Williams, Wiggins*, *Porter*, *Rompilla*. The state supreme court's application of *Landrigan* is unreasonable and contrary to clearly established federal law, §2254(d)(1), and rests on an unreasonable determination of the facts. §2254(d)(2). *De novo* review and relief are proper.

Argument II:

The prosecutor violated Nick's rights to due process and a reliable sentencing by arguing that Nick, not Chad, murdered Katelyn after twice establishing exactly the opposite to a different judge through sworn evidence and argument during the co-defendants' guilty plea proceedings. This conduct was egregious not only because both theories could not be true, but because the state deliberately chose to advance it after arguing at Nick's sentencing that the child's murder was the single factor that made the case deserving of a death sentence.

27

Argument III:

Trial counsel provided ineffective assistance by persuading his client to waive his fundamental right to a jury trial. Petitioner was deeply remorseful about the crime and believed that he should expose himself to a possible death sentence.  Counsel "outsmarted" Petitioner into believing a single judge would be more likely to sentence him to death than would a jury, when counsel in fact thought the judge would be lenient and return a life sentence.  This belief was based not on assurances of a life sentence, but on talk counsel "heard around the courthouse," and was prejudicially unreasonable conduct.

## ARGUMENT AND CITATION OF AUTHORITY

**I.    Petitioner's Sixth, Eighth and Fourteenth Amendment Right to the Effective Assistance of Counsel at All Critical Stages and on Appeal was Denied**

Nick Tate had the right at his pretrial, trial and sentencing to the effective assistance of counsel under the Sixth and Fourteenth Amendments, *Strickland v. Washington*, 466 U.S. 668 (1984), and at the motion for new trial proceedings and on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). To prevail on a claim of ineffective assistance of counsel, Nick must show first, "that counsel's performance was deficient," and second, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 686.

Counsel has an obligation in every capital case to investigate "the many circumstances" of the client's life history, including whether he has any mental health issues, *Andrus v. Texas*, 590 U.S. 806, 815 (2020), in order to "provide the [factfinder] with the mitigating evidence … which might well … influence[]" the "appraisal of his moral culpability," *Williams* 529 U.S. at 398, and lead to life imprisonment rather than the death penalty. The selection of a sentencing strategy before investigation is complete is unreasonable and contrary to the norms of capital representation. Where counsel does not discover what is available in mitigation, they are "not in the position to make a reasonable strategic choice." *Wiggins*, 539 U.S. at 536 (the decision to focus on residual doubt at sentencing and thus not to

29

thoroughly investigate the defendant's background and social history was unreasonable). This is what happened here.

Trial counsel did not hire a mitigation investigator and they did not investigate on their own. They spoke to no one other than their client and his parents. They knew that Nick had been raped as a child by his older brother and unreasonably believed this to be so compelling they did not need to investigate further. They knew that Nick had mental health issues and had been institutionalized but failed to follow up or obtain records until it was too late to use the information in them. When Nick pled guilty, his defense counsel relied on rumors that the trial judge would be lenient, to elect a bench trial at the penalty phase.

As in *Williams*, defense counsel's "tactical decision to focus [at sentencing] on [the Curtis abuse evidence]," *Williams, supra*, 529 U.S. at 396, was unreasonable because that tactic was chosen before the "requisite, diligent" investigation into the defendant's background had been conducted. *Id*., 529 U.S. at 515 (O'Connor, J., concurring). The result was that the sentencing court here did not hear anything of the compelling, available and persuasive evidence the habeas court found would have, in reasonable probability, resulted in a life sentence. D.96-1:28-54.

A.    **Unreasonable failure to investigate and present abundant mitigating evidence of upbringing and mental illness**

1.    **Overwhelming multi-generational mental illness**

As found by the habeas court, there was an extensive, multi-generational history of severe mental illness on both sides of Nick's family. D.96-1:34-35.  Expert testimony found this history "remarkable":

> Mr. Tate's paternal grandmother, Margaret Tate, suffered from chronic schizophrenia and had eleven separate admissions to Central Louisiana State Hospital in Pineville, Louisiana.  She was treated with electroshock therapy, Thorazine, and other drugs. Her records show she was admitted for several months at a time on a yearly basis, stabilized on medication, and then returned home.  Her final admission was a judicial commitment in 1978. Several of her siblings also spent time [there], and one of her brothers died there.  Another brother, who committed suicide, had been diagnosed with "shell shock," or posttraumatic stress disorder.

D.74-34:130-130.

This evidence was available:  Nick's paternal aunt, Priscilla Thompson, would have told counsel about how her mother's schizophrenia made her "lose her mind," and about the insidious mental illness in her siblings, D.74-34:254, and counsel could have obtained Margaret Tate's hospitalization records.  *See* D.74-38:71-88.  Priscilla lived with Nick and his family for many years and knew them intimately.  She attended Nick's trial.  She was never approached by Nick's lawyers, D.74-34:260, nor were her other siblings.

31

At least four of Oswald Tate's siblings have been treated for major mental illness, including schizophrenia and bipolar disorder. D.74-34:254-255, 289, D.74-35:16-19, D.74-34:287, 293.[18]

Major mental illness was equally prevalent on the maternal side. Nick's maternal grandmother suffered from severe mood swings and depression. D.74-34:269-70. His uncle Ricky Crader was diagnosed with schizophrenia and ruled incompetent at one point. D.79-1:47. Ricky sexually molested Nick's older brother Curtis and raped Nick's sister Kim. D.74-38:53-55. He was married nine times and had a daughter who committed suicide at age 15. He died at age 34 after overdosing on prescription medication. D.74-34:275. Maternal uncle Eddie Crader would have shared this information at Nick's trial, D.74-34:268-74, as would Lisa Abadie, who Ricky impregnated and married when she was 15 years old. D.74-35:12.

Nick's mother, Debora, suffered from depression and anxiety disorders and was medicated most of her adult life. D.74-36:2; D.74-34:88-89. She underwent psychological treatment at Three Rivers Behavioral

---

[18]   In 1993, when Nick was committed at age 13, Nick's father Oswald told doctors at Northwest Regional Hospital that there was a family history of mental illness. D.74-35:201. Counsel did not review these records until the week before trial. *Id*. at 186. Oswald could have testified to this, as could his brother Melvin and brother Paul's ex-wife, a booking officer at the Caddo Parish Sheriff. D.74-34:287, 293.

Health in Georgia from the time Nick was eight years old up until the time of the crime. She was prescribed multiple medications including Lithium and Oxycontin. D.74-36:133. Debora's sister Brenda also suffered from mental illness and was medicated from the time of the birth of her first child after marriage at age 13. She was a longtime drug abuser and died in 2013. D.74-34:23, 233, 285, D.74-35:18.

An expert could have told the sentencing judge that this family history of severe mental illness was remarkable, and meant Nick and his siblings were predisposed to mental illness.

> [] In addition to his mother, all of Petitioner's siblings suffer from mental illness, substance abuse or both. Curtis is a methamphetamine user; Kimberly is addicted to painkillers and also uses methamphetamine, and has been hospitalized numerous times for suicide attempts. Dustin was treated for an anxiety disorder and depression prior to the crime. In prison, he has been diagnosed with bipolar disorder, depression and PTSD. Chad has been diagnosed with bipolar disorder and depression, and with schizophrenia.

D.1-3:4. *See also* D.74-34:26.[19]

### 2.    Childhood of unrelenting trauma, cruelty and abuse

Seven mental health experts testified in state habeas and all, including the state's expert, testified that Nick's abusive and traumatic

---

[19]    Report and affidavit of Bushan Akharkar, M.D. *See also* Report of Dr. Bekh Bradley, D.74-34:133; Report of Dr. Kevin Richards, Ph.D., D.74-34:214-215.

childhood was "as extreme as any" they had ever seen.  D.74-34:213-14; *see also id*. at 30, 32, 43, 88, 137, 220.  The unrefuted evidence as found by the habeas court, was that Nick's mother

> suffered from severe mood swings and flew into sudden rages []. She hit Petitioner and his siblings with her fists and whipped them with belts.  [].  Debora Tate forced them to kneel and hold their ankles, sometimes nose to nose, and would "smack them or hit them with a shoe if they let go of their ankles or were not gripping them tight enough."  [].  She routinely yelled at Petitioner and his siblings, called them names, and berated them.  [].  Debora Tate whipped Petitioner for wetting the bed and sent his older brother Curtis to school in soiled clothing and to town with a sign saying, "I wet myself." [] Petitioner's parents also fought violently, both physically and verbally. [] Petitioner's father, Oswald Tate, worked on an oil rig and was absent for long periods of time when Petitioner was small. [].  However, he also beat the children routinely and harshly with belts, extension cords, and his fists [].

D.96-1:35-36.[20]

 Curtis informed Dr. Bradley he still remembered the humiliation of walking up to school wearing a diaper at age 7 or 8. D.74-34:142.  He "thought [his] name was motherfucker until [he] was 16 years old."  D.74-34:12.

Curtis is eight years older than Nick.  Many adults had the opportunity to observe Mrs. Tate's abuse of Curtis as a young child, since at that time the family all lived nearby in Louisiana.  Earl Ryder knew the

---

[20]     Internal citations to habeas record omitted.

family well when they lived in Oberlin, La., with Curtis, Kimberly and Nick.  He recalls Nick's mother forcing Curtis to balance on his knees for long periods while holding his legs off the ground, with his nose to the wall, akin to "a type of military torture" when he did not move fast enough. D.74-34:281.  Ryder recalled Curtis "cowering like a dog" trying to take the blame for something that was not his fault.  *Id.*

With Oswald's collusion, Debora would lock Curtis in a barn behind the house at night, then scratch and bang on the sides of it to frighten him. D.74-34:11. Ronnie Simmons, a childhood friend of Oswald, lived with the family for a time and recalls being in the car when the parents drove off and left Curtis, as young as age 5, alone in a graveyard at night and only returning after about 15 minutes. D.74-34:263.  He observed relentless abuse.  "I have seen Debora hit Curtis so hard in the face, she knocked the food out of his mouth and busted his lip." *Id*.

Putting the children on their knees for hours at a time and forcing them to hold their feet was echoed by Brenda Crader, Debora's sister, who said the boys had to face one another while kneeling, with their noses touching. *See* D.74-34:12.[21]

---

[21]    Affidavit of Nancy Smith, MSW.  Ms. Crader died after Ms. Smith interviewed her and before counsel could obtain an affidavit from her directly for the state habeas proceeding.

When Nick was four years old, Curtis was sent to live at a Masonic Home for Children.[22]  Nick and the other remaining children bore the brunt of Debora's abuse.

Eddie Crader, Debora's brother, tried to avoid making Debora angry because she would take it out on the children.

> The only time she interacted with her children was to punish them. … I recall her getting a belt and beating those boys for 10 minutes at a time without stopping for a second.  The boys would be covered in red all over their bodies.  You may think I am exaggerating, but I have never seen anything like it in my life.  My wife and I knew not to intervene because it would only make Debora worse.

D.74-34:272.[23]  Brenda Crader saw Debora beat the children with belts and take them into a bedroom to hit them with her fists, which she did often. Nick was hit with a belt for wetting his pants.  D.74-34:13. Brenda's daughter Amy Leger saw Debora whip Nick at age 5 or 6, then force him on his knees.  D.74-34:284.  *See also* D.74-34: 291 (Nick's aunt wanted to call the Department of Family and Children Services ("DFCS") but was told by her husband they should not interfere).

---

[22]    Curtis was sexually abused at age 5 by Mrs. Tate's brother, Ricky, and was sent to live in the Masonic Home at age 12.

[23]    She called the children "son of a bitch, asshole and pig," D.74-34:273, and called Petitioner's sister a "stupid, ugly bitch," and a "whore," *Id.* at 257.  *See also id.* at 277, 284.

36

### 3.    Rape by brother at age 8 and sadistic abuse by mother's boyfriend

In October 1987, Nick was withdrawn from second grade and the family, including Curtis, moved to Georgia.   It was fall and the weather was turning cold.   They lived in a pop-up trailer in a park, using a hair dryer to try to heat it.   They were there for nearly six weeks before finding a modest rental home.  As found by the habeas court:

> In August 1988, Debora Tate reported to counselors at Three Rivers Behavioral Health that Curtis had been molesting Petitioner and his younger siblings. [].  Petitioner later reported to a social worker that he had been anally raped for a year. [].  As noted in the Three Rivers records, the Tate children expressed "anger, fear, shame and embarrassment" over the molestation. [].   According to the records, Petitioner asked for help in controlling his anger, which had become "more uncontrollable," and he reported having stopped attending school. *Id.*   School records show that Petitioner failed second grade and was placed in remedial second grade. [].[24]

D.96-1:36 (citations omitted)(footnotes added).

Curtis was sent to youth detention but upon his release, again began sexually abusing his siblings.  He was charged as an adult for molesting ten-year-old Nick and raping his sister Kim in the spring of 1990.  Nick's reaction was to cry and beg his mother not to tell anyone so he would not

---

[24]    The following year, at age nine, he again failed second grade and was in remedial second grade.  He was promoted to third grade.

have to "go through this anymore." D.74-37:315. D.74-37:313. In October 1990, Curtis pleaded guilty to incest and child molestation.

The family uprooted back to Louisiana in spring of 1991. Oswald commuted to Georgia several times for work. On one trip he picked up a hitchhiker, Peter Johnson. Johnson and Debora started a sexual relationship and Oswald moved back to Georgia.[25]

Johnson was "a wolf in sheep's clothing" who physically and mentally abused the children. He beat them "for anything," threatened to kill them at gunpoint, and forced food down their throats. D.74-34:234, 227. As found by the habeas court,

> The record reflects that Mrs. Tate's boyfriend, Peter Johnson, lived with the family and physically abused the children and Mrs. Tate. [] He forced the boys to kneel on frozen rice scattered on the floor for hours, held them at gunpoint, and force-fed them. []. Mr. Johnson punished Petitioner's 10-year-old brother Dustin for wetting the bed by stripping him naked, hosing him with freezing water, and threatening to glue his penis shut with plumber's glue. Mr. Johnson once put Dustin on his knees on frozen rice and would not let him up until Mrs. Tate performed oral sex on Johnson in Dustin's presence. []. ...Petitioner told Dr. Richards that Mr. Johnson would keep them on their knees for 24-36 hours at a time with only bread and water to eat.

D.96-1:37 (citations omitted).

_____

[25]    D.77-1:30, 32. Kim moved out also.

On an occasion when Dustin interfered with Johnson's punishment of Chad:

> Pete busted Dustin in the face and put him on his knees. He put a bullet in Dustin's mouth and told him it was time for him to bite the bullet. He also stuck a gun to Dustin's temple and threatened to kill him. …I also have a memory of Pete pulling a chainsaw on us and threatening to cut off parts of our body.

D.74-34:227.

Nick alternated between tears and anger over his mother's mistreatment. He kept a machete under his bed. He showed his cousin Crystal marks on his wrist from cutting himself and said he wanted to kill himself. Crystal testified that she did not "ever" see him happy. D.74-34:13.

He returned to his father's in Georgia alone in the summer of 1992, age 12. D.79-4:2-3. As found by the habeas court,

> Records admitted from the Department of Family and Child Service ("DFACS") show the agency was called to the Tate's trailer park in October 1992 after a complaint of child abuse or neglect, following a fistfight between Petitioner and his father. []. Petitioner attended school in Paulding County for a few weeks but stopped when he was bullied for having been sexually molested.[] Following another fight with his father, at the age of 13, Petitioner was committed to Northwest Georgia Regional Hospital for 30 days for psychological evaluation.

D.96-1:37.

Two months later, Curtis was released from prison.

39

### 4.    Commitment to mental hospital at age 13

The NGRH records show that as a 13-year-old Nick suffered from clear symptoms of traumatic stress, with distorted thinking, hopelessness, self-hatred, and signs of "major depression with psychotic features."  D.74-35:205.  He reported he did not want to live anymore.  As noted by the habeas court:

> He made statements suggesting grandiosity and paranoia which were "possibly delusional" and reported he thought he was crazy. []. Though he had denied hallucinations earlier, Petitioner said he heard voices saying "come to me." *Id.*  His judgment and insight were poor. *Id.* The psychologist noted that he experienced much stress at school due to difficulty doing his work and the harassment by other students regarding his sexual molestation,[26] which led to "inappropriate emotional responses and distorted thinking," and then violence or threatened violence. [].

D.96-1:40. (citations omitted).  His affect was inappropriately flat and calm when discussing sexual abuse, a classic symptom of dissociation from a traumatic event.  D.74-35:36.

A caseworker informed the hospital that DFCS had been involved with the family for many years due to sexual abuse by Curtis and possible

---

[26]    Nick stopped going to school because DFCS and police had questioned him in front of school administrators about being molested by Curtis.  "Somehow the information got out all over the school" and he was bullied and called "fag" and "queer."  D.74-34:236

physical abuse by the father. *Id*. at 201. Nick told staff that his father had hit him on the head and left temple repeatedly on different occasions, after which he could not see for a while. *Id*. at 258.

Nick underwent personality testing, on which "[he] endorsed many items suggestive of psychiatric disturbance." *Id*. at 204. He "live[d] in fear all the time" and was afraid someone was watching him; he "knew someone is listening to us right now," and believed that there was a speaker somewhere in the room. D.74-35:202. He thought he was crazy. *Id*.

Further psychiatric treatment and examination for medication was recommended but not implemented. *Id*. at 205.

### 5. More sexual abuse, and incest between the siblings

After Nick's release Debora moved back to Georgia, resumed counseling at Three Rivers and was prescribed a variety of anti-depressant, anti-anxiety and opioid medications. D.74-34:76, 89.

Nick's Aunt Priscilla was living nearby with her husband Freddie Osteen. On the alternate weekends he had custody that summer, Oswald would often leave the boys with Priscilla. Osteen molested all of them. Chad testified that Osteen made them perform sexual acts on him and

sexually molested them.  D.74-32:210.  Nick told Dr. Richards about this.
D.74-36:153.  This lasted for several months, according to Dustin.[27]

Chad reported that he was "indifferent" to the molestation as "it was
happening all the time.  I didn't see it as wrong."  D.74-34:228.  One of his
early memories was of his sister Kim molesting him along with a male he
thinks might have been Curtis.  *Id.*

The habeas court noted testimony that the Tate children routinely
had incestuous relationships with one another throughout their
adolescence and continuing until their arrests in 2001. D.96-1:38.  *See* D.74-
32:178-79, 207-09 (testimony of Dustin and Chad).  According to trauma
expert Dr. Bradley, the sexual abuse the children suffered at the hands of
Curtis and others are "almost certainly the predominant contributing
factors to the fraternal incest that both Chad and Dustin report."  D.74-
34:199.

### 6.    Self-medication, suicide, crippling anxiety and cry for help

Nick began using drugs after his mental hospital commitment and
the subsequent sexual abuse by Freddie Osteen, D.74-34:170, D.74-36:144,
D.74-34:102, ultimately including painkillers oxycontin and MS Contin
which he obtained from his mother.  *Id.* at 103-04.  His sister Kim obtained,

---

[27]    At the time of the habeas proceedings Osteen was serving a prison
sentence in Florida for child molestation.  D.79-2:13-28.

abused and provided prescription medications including downers, percocet, Vicodan, Darvocet and painkillers.  D.74-34:236.  His mother would give him "nerve pills" when he was under stress and having panic attacks.  D.74-34:229.

In 1998, Nick was repeatedly hospitalized for overdosing on pills.  As summarized by Pablo Stewart, M.D., a psychiatrist specializing in substance abuse, he was referred back to NGRH from a local hospital, and admission notes stated that Nick had two suicide attempts in two weeks from overdosing.

> He related to ambulance personnel that he had previously overdosed on 20 Somas (muscle relaxants), 15 Xanax and five Darvocets, and that he had "today" taken 20 Somas.  (Paulding Wellstar Hospital Records).

D.74-34:95-96.  His substance abuse continued with increasing frequency and severity throughout his teens.  *Id.* at 74.

In addition to his increasing use of drugs, Nick experienced overwhelming anxiety.  Being in public spaces caused symptoms such as racing heart, dry mouth and shaking.  *Id.* at 28. He "wouldn't even go to a hospital willingly" when he had kidney stones.  D.74-34:240.   He cut himself in reaction to stress and would burn himself with cigarette lighters.  D.74-34:230.

In the months and weeks leading up to the crime, Nick became increasingly stressed.   He paid "all the bills," D.74-34:229, and "held everything together," including the family business.  *Id*. at 239. His mother

43

was "on disability and totally dependent on Nick." *Id.* at 240. Nick told Randall Carter, his employer, that he had to help with his mother's bills because she couldn't work, although Carter overheard the brothers talk about her being on drugs. D.74-35:21.[28]

Nick "hit the wall," in January of 2001, D.74-34:240, and sought help from Three Rivers Behavioral Health. Records show Nick presented with "extremely high anxiety, evidenced by rapid speech, fidgety behavior and an aroused state." *Id.* at 174. He told the counselor he could not be in crowds and so only worked and stayed home, having no other interactions with people, that he could sleep no more than 2-3 hours per night due to nightmares. He related sexual abuse and several suicide attempts, one a year before which "almost ended in death." D.74-35:61.

He was prescribed Paxil and told to come back, but he did not. He later told Dr. Richards that he could not bear the crowds in the waiting room. D.74-34:210.

Eleven months later, the crimes occurred.

None of this evidence was disputed. Much of it was contained in records, including, as the habeas court noted, the Three Rivers records as well as 1998 Paulding Wellstar Hospital records documenting Nick's

---

[28] Counsel never attempted to speak with Randall Carter. D.74-35:21, or with girlfriend Laura Ashley, who attested to Oswald's severe gambling problem, and reliance on Nick to pay his bills. D.74-35:2-3, 5, 7.

44

attempted suicides; and Three Rivers counseling records of Debora Tate.
D.96-1:40-42.

There were also mental health records from two months after Nick's
arrest, after referral by the Paulding County jail. D.74-35:58. As
summarized by the habeas court:

> [] Three Rivers (Highland Rivers) mental health records from
> February – March 2002, in which Petitioner described suffering
> flashbacks and nightmares, and hearing voices. []. Petitioner
> also reported being hospitalized at NGRH at age 18 following a
> suicide attempt by drug overdose as well as suicide attempts at
> ages 14 and 16. []. He also stated his "brain isn't the same" and
> that he "destroyed [himself] when that gun went off." [].
> Petitioner spoke of social anxiety and said, "I don't go
> anywhere" and "I have nothing inside," Id. He expressed
> remorse in stating "what's gone on is horrible". Id.
> Additionally, Petitioner admitted long-term heavy use of
> cocaine, meth, acid, marijuana, and alcohol. []. The psychiatrist
> who saw him recommended neuropsychological testing. [].

> [] Jail records which reflect that Petitioner was treated by Three
> Rivers and which contain copies of the 2002 Three Rivers notes
> and the recommendation for neuropsychological testing. [].

D.96-1:40-42.[29] Trial counsel got none of these records so were ignorant of
the recommendation for neuropsychological testing.[30]

---

[29]   The habeas court also credited the testimony of Leslie Lunney, a
licensed professional counselor who treated Mrs. Tate from 1993 to
1995. D.96-1:34.

[30]   The habeas court found that counsel "knew or should have known
about all these records" but did not because they failed to investigate

45

### 7. Unrefuted expert testimony:

All of the experts below agreed that Nick suffered chronic trauma manifesting as complex post-traumatic stress disorder, brain damage, and trauma-induced polysubstance dependence and abuse.

### a. Chronic trauma with physiological changes to the brain

Fredric Sautter, Ph.D., a psychologist specializing in trauma, and trauma expert Bekh Bradley, Ph.D, reviewed records and background information on Nick. Both opined that Nick exhibits symptoms consistent with Complex Posttraumatic Stress Disorder ("Complex PTSD"), D.74-34:58-61, 123, 186, an "especially severe form of PTSD," *Id.* at 57, arising from severe, repetitive trauma which usually begins early in life. Its symptoms include the "inability to regulate emotions, disassociation, depression, suicide and self-destructive behavior, substance abuse and post-traumatic stress." *Id.* at 46.[31]

Trauma of the extraordinary type and degree experienced by Nick causes physiological changes in the brain, according to Dr. Sautter. Complex PTSD "is especially destructive as it has a powerful and pervasive

---

even though "Petitioner himself requested that counsel obtain his jail records, which referenced his treatment at Three Rivers in 2002, and asked for his mental health records. (HT 1:93-94)." D.96-1:42.

[31]  Complex PTSD is a widely recognized diagnosis and was known and available in 2005. *See* D.81-1:162; D.81-2:185-86, 84. This evidence was unrefuted by the state supreme court. *See Tate* at 220, 238 n.19.

impact on the traumatized person's ability to control their thoughts, emotions, and behaviors in situations that make them threatened or ashamed," and "adversely affects the individual's ability to think logically and may put them at risk for self-destructive behavior." D.74-34:57-58.

Dr. Bradley concluded Nick "clearly was suffering from significant and impairing symptoms of a mental disorder at the time of the crime," D.81-2:89. State's expert Dr. Norman agreed that each of the risk factors outlined by Dr. Bradley is "associated with psychiatric disturbance, including possible brain damage" and that "[t]ogether, the sheer number of these factors, and the degree to which these factors was present in Mr. Tate's development, is significant." D.74-34:219-20.

The habeas court credited this testimony, D.96-1:45-46, and the state supreme court accepted it as true.

### b.    Brain damage

A neuropsychological evaluation of the type recommended in 2002 by Three Rivers Behavioral Health was performed in 2012 by Dr. Robert Shaffer. As found by the habeas court,

> Dr. Shaffer's testing revealed that Petitioner has brain damage in the right parietal and frontal lobes. []….
>
> Dr. Shaffer testified that his testing revealed significant impairment in specific subtests which "suggests that [Petitioner] has trouble anticipating and thinking ahead of what will be the consequence of specific actions that he takes in sequence." []… Dr. Shaffer testified this means that in new or unfamiliar situations, a person with this sort of brain damage would have

47

trouble conforming their behavior appropriately where a situation changed in an unanticipated manner.  [].

D.96-1:43-44.

Each of the experts who reviewed Nick's background and mental health history concurred with Dr. Shaffer's findings that Nick has brain damage.  The state courts accepted it as true.

### c.    Trauma-induced substance abuse

The habeas court also credited the testimony of substance abuse expert Dr. Pablo Stewart, who evaluated Nick to assess his drug and alcohol history and its impact on his mental state and functioning in light of his trauma history. Dr. Stewart opined that Nick suffered "from chronic drug dependence, that … began wholly as an effort to self medicate for the serious depression, extreme anxiety, and feelings of shame which stemmed from his incredibly traumatic upbringing and sexual abuse[.]"; and that his underlying organic brain deficits made him particularly vulnerable. D.74-34:116.  Dr. Stewart's conclusions make plain that Nick's drug addiction was not a conscious and free choice but a reaction to his chaotic and traumatic upbringing.  *Id.* at 113.  "Substance abuse is a classic symptom of complex post-traumatic stress disorder."  *Id.*  As noted by the habeas court, Respondent's expert Dr. Norman concluded that Nick's crime was "the result of his drug dependency and usage, and his compromised abilities to cope with the circumstances." D.96-1:48 n.36; D.74-34:217.  And this was also the opinion of Judge Foster, the original trial judge, who believed the

48

crime would never have happened but for the drug use, which caused a situation to spiral out of control.[32]

### B.  No strategic reason for failing to investigate:  Counsel ignored red flags.

*Strickland* mandates a diligent and complete investigation **before** choosing a sentencing strategy.  *See Williams*, 545 U.S. at 396, 415. "In assessing the reasonableness of an attorney's investigation...a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 525.   The known evidence here was considerable.   Yet, "counsel disregarded, rather than explored, the multiple red flags" in his client's life which would have led to "powerful mitigating evidence." *Andrus*, 590 U.S. at 816.  *See also Jefferson v. GDCP Warden*, 941 F.3d 452, 481 (11ᵗʰ Cir. 2019) ("As [this Court has] said many times, '[a] failure to investigate can be deficient performance in a capital case…where counsel ignores "red flags" that any reasonable attorney would perceive as demanding further investigation.").[33]

---

[32]    *See supra* at n.9.  This opinion was also consistent with the recitation of facts by the District Attorney at Dustin's guilty plea.  *See* D.74-37:83-84.

[33]    See *Rompilla* 545 U.S. at 391 (counsel must notice and act upon "red flags"); *Daniel v. Comm. Al. Dept. of Corr.*, 822 F.3d 1248, 1282, n.21 (11th Cir. 2016) (counsel ineffective for failing to "follow up on the many red flags" regarding petitioner's intellectual functioning); *Ferrell v. Hall*, 640 F.3d 1199, 1234  (11th Cir. 2011)(counsel ignored

As the habeas court properly found, all of the information regarding Nick's traumatic background could have been corroborated and explained in detail by family members and others, and by extensive records. But counsel did not hire a mitigation investigator and "did not themselves perform the 'requisite, diligent' mitigation investigation that is constitutionally required," by speaking with witnesses or discovering records. D.96-1:49, citing *Williams*, 529 U.S. 362 at 415. This was deficient performance. *Id*.

There was no strategic reason for this. To Cella, investigation meant having an investigator collect documents. Then, if there was anything there he thought worth pursuing, he would talk to witnesses. D.81-1:43.

The habeas court summarized this methodology and how it worked [or more accurately, did not work] in Nick's case. Quoting Cella:

> "the phrase investigation for the sentencing phase, to me that means collecting documents. That's done by the investigator – I don't get involved in that." []. As previously discussed, trial counsel hired Hal Johns as an investigator in Petitioner's case, however, Mr. Johns testified via affidavit that he did not perform a mitigation investigation. []. Further, Mr. Johns gathered records during voir dire, after Petitioner's trial had already begun. []. The record reflects that trial counsel also did not obtain Petitioner's school records until after his trial had begun.

---

"many red flags concerning the available mitigating evidence about mental health"); *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (the many red flags noted above would have prompted a reasonable attorney to conduct additional [mitigation] investigation.").

50

> Therefore, it would have been too late to use the records as a basis for further investigation regardless of what information the school records contained. [].

D.96-1:50.

There is no dispute that Nick and his parents were the only people counsel spoke to in their "investigation."  D.81-1:43. *See also id*. at 45. This was deficient.  *See Andrus*, 590 U.S. at 816 ("Aside from [Tate's] mother and [] father, counsel did not meet with any of [his] close family members, all of whom had disturbing stories about [his] upbringing.").[34]

And although the parents were "absolutely" "supportive and willing to help," D.81-1:44, counsel rejected this help because, as found by the habeas court, Cella testified:

> he found Petitioner's parents to be "poor, rural, uneducated people" and because he "pretty much knew how to investigate a background," he didn't need any [names of people to talk to] from them." [].

D.96-1:51; *see also* D.74-33:96. Counsel "not only neglected to present" the available and compelling mitigation here, "he failed even to look for it." *Andrus*, 590 U.S. at 808.

---

[34]    As found by the habeas court, Reed interviewed Chad Tate after the trial began about the brothers' roles in the crime but he did not ask about mitigation, and he did not try to speak with Dustin.  D.96-1:50, n.40; D:81-1:115-16.

Cella's neglect was due largely to his narrow preoccupation with the mitigating value of the childhood rapes by Curtis, and why he told the trial court he didn't need a mitigation investigator. D.79-5:10-11, 34. He explained at his deposition that "there wasn't much to investigate, really" since Curtis had been convicted and served a prison sentence for the abuse. D.81-1:41-42. "I felt like I had a real good handle on what happened; it was a horrible thing." D.81-1:41-42. *See also* D.81-1:107 (Reed recalling that counsel's "concern was about the child molestation that he was a victim of.").

And, once he heard that newly-substituted Judge Beavers supposedly had a reputation for leniency, Cella's strategy was to have Nick waive a jury and opt for a bench trial. *See* D.74-32:104; D.81-1:111,122; D.81-1:51; D.74-35:36.

### 1.    Red flags in sexual abuse

Counsel's obsession with the Curtis incident, which they found so appalling that "everything else paled in significance," D.74-32:71, meant they failed to appreciate its consequence as an alert that something was very wrong with the family.   As found by the habeas court,

> Trial counsel focused on the sexual abuse of Petitioner by his brother Curtis and Mr. Cella testified that he did not recall other abuse in the family being a factor. (HT 1:67; 26:6583-6584).  The abuse by Curtis was a red flag that Petitioner's family should be investigated.

52

D.96-1:51.  Counsel's narrow focus halted their investigation "at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.  The result was, as the habeas court found, counsel did not know about Nick's "nightmarish" childhood outside of the Curtis abuse.[35]

Reed believed Nick's upbringing was awful, but this was based solely on what he knew –the sexual molestation by Curtis, lack of education, and negligent parenting.  D.74-33:65. Counsel were also not aware of other sexual abuse even though Dr. Richards's September 2003 report mentioned "multiple" perpetrators.  If counsel had asked, Dr. Richards could have told them, from his notes, that the aunt's husband, Freddie Osteen, had also molested their client.

As in *Wiggins*, counsel "abandoned their investigation of Petitioner's background after only a rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524.  Counsel's "judgment to so sharply limit [his] inquiry fell far outside the wide range of professionally competent assistance." *Ferrell*, 640 F.3d at 1199.  D.96-1:50.

---

[35]    The Georgia Supreme Court claimed Cella discussed abuse by the father with Nick, *Tate* at 218-219, but Cella's testimony was that he did not recall other abuse in the family being a factor, D.81-1:29.  The same was true for Reed when asked directly about this.  D.81-1:117.  And, asked if physical abuse was not discussed because Nick was not "forthcoming" Reed said, "No, I don't think it was …."  D.74-33:46.

## 2.    Red flags in competency report

Counsel "also failed to investigate and present mitigating evidence of [Nick's] psychiatric history and mental illness despite being alerted to potential issues in Dr. Richards's competency evaluation."  D.96-1:39. As found by the habeas court,

> Mr. Cella testified in habeas proceedings that he did not do anything with the information contained in Dr. Richards's report because the conclusion was that Petitioner was competent, so it "wasn't particularly helpful." []. A conclusion of competency has no relevance to the need to present mitigation.

D.96-1:51. *See also* D.74-35:34 (Reed testifying that "[m]ental health was not considered an issue once he was ruled competent.").[36]

There is no dispute counsel never followed up by investigating Nick's  mental health.   As the state supreme court acknowledged, *Tate* at 208, 222, counsel considered using Richards only to address Dustin's influence over Nick, and possibly his drug use.  D.79-5:14, D.61-8:33.   As found by the habeas court, counsel "did not present Dr. Richards as a

---

[36]    This was unreasonable.  *See DeBruce v. Comm., Ala. Dept. Corr.*, 758 F.3d 1263, 1271-1272 (11th Cir. 2015) (failure to investigate mental health and background ineffective where pretrial competency report flagged to the issue); *see also Hardwick v. Fla. Dep't of Corr.*, 803 F.3d 541 (11th Cir. 2015)(red flags in competency report);  *Saranchak v. Sec'y, Penn. Dept. of Corr.*, 802 F.3d 579 (3d Cir. 2015)(same); *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008)("the information trial counsel did acquire" would "have led a reasonable attorney to investigate further.")

54

witness 'because it was not the main thrust of [their] argument that [Nick] should not receive the death penalty.' []." D.96-1:51.

Competent counsel would have recognized the need to investigate the mitigating value of their client's background and mental health history before deciding the "main thrust" of their mitigation strategy. Simply obtaining and reviewing school records could have changed the evidentiary picture:

> Petitioner's school records show multiple school changes, remedial retention in the second grade, poor attendance, and the failure of Petitioner's parents to respond to the school's expressions of concern. [] They also reflect Petitioner's commitment to Northwest Georgia Regional Hospital pursuant to court order just after his 13th birthday, and that he stopped attending school in the beginning of sixth grade. []. Mr. Cella testified that he never inquired about the circumstances of Petitioner's dropping out of school and what sort of school system would allow a 13-year-old not to attend school. [].[37]

D.96-1:50. Counsel reviewed the school records six days after jury selection began, D.79-4:46, when "it would have been too late to use the records as a basis for further investigation regardless of what information [they] contained." D.96-1:50.

---

[37] *See Daniel*, 822 F.3d at 1282, n.21 (poor academic record and problems learning were red flags).

### 3.    Red flags in mental health records

Similarly, counsel failed to review the only other records they obtained, the NGRH mental health records, until after jury selection began.[38]  D.79-4:46.  In those records was information that several uncles and both grandmothers had been diagnosed as manic-depressive, and a paternal uncle committed suicide – more red flags. A reasonable investigation would have led to further records that Nick's paternal grandmother was institutionalized repeatedly for schizophrenia and that nearly all his aunts and uncles had been diagnosed with serious mental illness, many flagrantly psychotic. *See* D.74-38:71 – D.74-39:35, D.74-34:6-25.

At minimum, counsel could have submitted these records and the trove of mitigating psychiatric information they contained to the trial court for review, as he did with Curtis' conviction for sexual molestation.  D.74-35:202.  But counsel waited until the last minute.  D.79-4:46. No reasonable capital counsel would "wait until the guilt stage ended before beginning to investigate the existence of non-statutory mitigating circumstances." *Johnson v. Dept. of Corr.*, 643 F.3d 907, 932-33 (11th Cir. 2011).

And, they never obtained the records from Three Rivers that their client specifically requested, D.74-32:100; D.85-5:150-151. Those 2001

---

[38]    Dr. Richards, who was employed at NGRH at the time, obtained some records prior to or simultaneous with his second competency evaluation in August 2005 but his report contains only a barebones reference from the 1993 evaluation summary. D.74-34:211-212.

records showed Nick's plummeting mental state less than eleven months before the crimes. D.74-35:61. These were independently mitigating and could also have been submitted to the court. Separately, there were years of Three Rivers records from Nick's mother that would have led counsel to powerful mitigation. D.74-32:53.

### 4.    Red flags regarding brain damage

In the 2002 records, the Three Rivers psychiatrist recommended that Nick be evaluated by a neuropsychologist. D.74-35:63. Competent counsel would have acted on the recommendation or at least asked Dr. Richards about it. Richards, if he had seen the records, "would have advised counsel that they should have a neuropsychologist perform comprehensive testing on Nick, as recommended." D.74-34:213; D.81-3:236-38. This would have shown that Nick suffers from brain damage of the type discovered in habeas proceedings by Dr. Shaffer. D.74-34:31-37. "No reasonable lawyer in counsel's position at the time would have decided not to have Petitioner tested for brain damage," *Jefferson v. Sellers*, 250 F.Supp.3d 1340, 1380 (N.D.Ga. 2017).[39] There were actually two sets of records which contained

---

[39] *See also Jefferson v. Upton*, 130 S. Ct. 2217 (2010)(noting significance of "permanent brain damage" that "causes abnormal behavior" over which he 'has no or substantially limited control," including "impulsiveness," "diminished impulse control," "impaired social judgment"); *Rompilla,* 545 U.S. at 392 (organic brain damage can be mitigating evidence); *Williams*, 529 U.S. at 370 (mitigating evidence counsel failed to present at trial included testimony that he "*might have* mental impairments organic in origin")(emphasis added);

the neuropsychological recommendation.  D.74-35:171-185.  Counsel got

neither.  They also did not get the hospital records documenting Nick's

attempted suicides despite knowing about them from Nick.  D.74-35:111,

D.74-35:108-128.

Counsel had over three years to investigate. Their time sheets show

the lack of investigation from 2002 onward.  D.79-4:44-80.  Counsel never

offered, and no evidence supports, any tactical rationale for the pervasive

oversights and lapses here.  The "untapped body of mitigating evidence

was, as the habeas hearing revealed, simply vast."  *Andrus*, 550 U.S. at 816.

The habeas court's factfindings, robustly supported in the record,

show counsel's failure to present any of this evidence discovered and

presented in the habeas proceedings was not strategic.  It stemmed from

inattention and was unreasonable.  *Wiggins,* 539 U.S. at 534; *Williams,* 545

U.S. at 396.

---

*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 237 (2007)(constitutionally
relevant mitigating evidence includes "possible neurological
damage").

58

**C.    The Georgia Supreme Court opinion is contrary to and an unreasonable application of *Strickland* and is based on an unreasonable determination of the facts**

> **1.    Defense counsel were prejudicially ineffective and the Georgia Supreme Court reversed the state habeas court by misapplying clearly established federal law and unreasonably determining facts unsupported in the record**

In reversing the habeas court, the Georgia Supreme Court did not disturb that court's findings that counsel rendered ineffective assistance in investigating and presenting mitigation evidence. *Tate* at 238 n.15.

Instead, the state supreme court mischaracterized the record evidence as showing Nick had forbidden counsel from presenting any mitigation, and so relief was precluded by *Schriro v. Landrigan*, 550 U.S. 465 (2007). *Tate* at 209. "Even assuming that trial counsel were deficient in investigating mitigating evidence," *Tate* at 224, Nick's purported actions preventing counsel from presenting mitigation meant he "cannot establish *Strickland* prejudice as a result." *Id.* at 216.

The state court is wrong. Here, "*Landrigan* does not govern because the major gap in [Tate's] mitigation case is attributable to counsel's actions rather than [Tate's]." *Waidla v. Davis*, 68 F.4th 575, 594 (9th Cir. 2023). The state court's conclusion otherwise is contrary to and an unreasonable application of Supreme Court law, and rests on unreasonable determinations of the facts in light of the state court record. § 2254(d)(1) and (2).

a. **The Georgia Supreme Court disregarded explicit legal distinctions: Nick did not instruct counsel not to present any mitigation and *Strickland*, not *Landrigan*, applies**

The Supreme Court in *Landrigan* faced for the first time a situation where a defendant "refused to allow the presentation of any mitigating evidence." 550 U.S. at 478.  Landrigan stated at trial that he had instructed his lawyers not to present mitigation.  He then "interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating." *Id.* at 476-77.   The defendant's resolute and unequivocal directives to curtail mitigation evidence prompted the *Landrigan* Court to conclude he "would have undermined the presentation of any mitigation evidence that his attorney might have uncovered."  *Id.* at 477.

The Supreme Court distinguished the circumstances in *Landrigan* from those in *Rompilla*, where "the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented."  *Landrigan* at 478, citing *Rompilla*, 545 U.S. at 381.  Even where a defendant is "actively obstructive," counsel must still investigate, *Rompilla*, 545 U.S. at 381, and counsel's actions and omissions are properly analyzed under *Strickland*.

Just two years later, the bright-line distinction between *Landrigan* and cases like *Rompilla* was reemphasized by the Supreme Court.   In a case where the defendant instructed counsel not to speak with two witnesses,

60

his ex-wife or son, but did not give any other instructions limiting the witnesses that counsel could interview, the Supreme Court found

> [Petitioner] may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct some sort of mitigation investigation. *See Rompilla, supra* at 381-82.

*Porter*, 558 U.S. at 40.

The *Porter* Court went on to find that counsel were ineffective where they ignored information in court-ordered competency evaluations and "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service." *Id*. at 40.

This Court and others have similarly distinguished the circumstances in *Landrigan* from those in *Rompilla*, where the defendant was "actively obstructive" but did not curtail all mitigation. *See, e.g., Conner v. GDCP Warden*, 784 F3d 752, 768 (11th Cir. 2015)(where defendant affirmed instructions not to present anything in mitigation during colloquy, "[t]he record demonstrates that [defendant] prevented trial counsel from presenting mitigating evidence, and distinguishes [his] case from other cases where counsel was found ineffective for failing to investigate and present mitigation such as *Rompilla* and *Wiggins*." (citations omitted); *Gray v. Branker*, 529 F.3d 220, 232 (4th Cir. 2008)(the *Landrigan* court, in holding counsel is not required to present mitigating evidence against his client's clear directive, "was careful to distinguish [Landrigan's] circumstances

61

from those in *Rompilla*"); *Blystone v. Horn*, 664 F.3d 397, 424-26 (3d Cir. 2011) (limiting *Landrigan* to cases where the defendant has demonstrated a strong determination not to present any mitigating evidence; *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009)(*Landrigan* prejudice holding does not apply when the defendant "did not threaten to obstruct the presentation of any mitigating evidence."); *Thomas v. Horn*, 570 F.3d 105, 128-29 (3d. Cir. 2009)(same).

Like the petitioner in *Porter*, Nick asked only that counsel refrain from presenting two witnesses. Nick did not inform the court that he did not want mitigating evidence presented, and mitigation was presented. Cella unequivocally testified that his client was cooperative, D.81-1:25, 31, told his life story, D.74-32:78,[40] *did not ask* that counsel not speak with other family members or friends, D.81-1:42; *did not tell* counsel not to investigate, D.74-32:74; *did not object* to the presentation of any witnesses other than Curtis and his mother, D.81-1:58; "approved" the submission of Curtis's conviction for molesting him, D.74-35:35; and would have permitted more. *Id.* Nick did not care about whether Dr. Richards testified, D.74-32:109, and had no "strong opinion one way or the other" about presenting evidence of substance abuse. D.74:32:84. *See also* D.81-1:120 (Reed's deposition testimony that he did not remember Nick ever telling him not to talk to any

---

[40]    Cella explained that clients, "don't know what mitigation is. They know how to tell their life stories. He told his." D.74-32:78.

witnesses); D.74-32:74 (there were no other witnesses in the mitigation investigation Tate did not want counsel to talk to).

> Q: (By counsel for Respondent) What was Mr. Tate's attitude toward the presentation of mitigation, *other than the Curtis stuff* you talked about?

> A: (Cella) Oh, he tolerated it. I told him I had to do it and that I was going to do certain things. That that was what I was appointed for and if I didn't do it we were going to end up having to do this all over again. So, he tolerated me doing it; he didn't encourage it.

> Q: Did he – other than the Curtis stuff – ever object to you presenting or calling witnesses?

> A: No.

D.81-1:58. "Tolerate," is not *Landrigan*. It is *Rompilla*, and *Porter*. So is "didn't encourage." Not "ever objecting" to presenting or calling witnesses is not *Landrigan*, it is *Rompilla* and *Porter*. In contrast, the speech and conduct of the defendant in *Landrigan* meant he "would have undermined the presentation of any mitigation evidence that his attorney might have uncovered." *Id.* at 477.

The state supreme court unreasonably applied *Landrigan* on facts materially indistinguishable from governing Supreme Court law – a defendant who was not enthusiastic about presenting mitigation but who neither obstructed nor told his counsel or the court he did not wish to present any mitigation. *Rompilla*, 545 U.S. at 381. This is contrary to and an

unreasonable application of clearly established law and an unreasonable factual determination within the meaning of § 2254(d)(2).

> **b.     The Georgia Supreme Court's unreasonable application of *Landrigan* rests on a single, clearly erroneous sentence in the guilt portion of the habeas court decision, as emphasized by the district court.**

How then did the state supreme court here conclude that Nick forbade all mitigation when it cannot cite to a single instance in the trial proceedings where Nick told counsel or the court that he did not want mitigation presented, and mitigation was presented?

How did it discount the habeas court's specific factfindings, amply supported in the record, that the only thing Nick did not want presented was Curtis and his mother?[41]

----

[41]     Those factfindings from the habeas court:

> The record reflects that Petitioner did not want trial counsel to discuss the rapes by Curtis at trial. (HT 1:68; 4:788).  Petitioner also did not want his mother to testify because he did not want her subject to the district attorney's cross-examination.

D.96-1:31. And:

> Although Petitioner might have expressed that he did not want evidence regarding his molestation by Curtis to be brought out in court, trial counsel's failure to present any of the extensive evidence of

The state supreme court relied on a sentence in the habeas court's order denying guilt phase relief, that came from an erroneously filed and irrelevant pretrial motion from another case. As the District Court found:

> [C]ounsel mistakenly filed a pretrial motion that had language from another case that the defendant wanted to waive the presentation of mitigating evidence. [See Doc. 105 at 103]. Once trial counsel discovered the error, he withdrew the motion. Nonetheless, discussion from that motion made its way into the state habeas corpus court's opinion, having been pasted there from a draft order prepared by Respondent, and Respondent has admitted that the language did not belong in the draft order.

D.118:20.[42]

> That language was:

> The record shows that following trial counsel's attempts to negotiate a plea, Petitioner expressed a desire to plead guilty, *did not want trial counsel to present mitigation evidence*, and wanted to receive the death penalty. (MHT, 4/9/04, pp. 31-32).

---

Petitioner's family life was unreasonable and Petitioner suffered resulting prejudice.

D.96-1:54.

[42] *See* D.55-4:305. Cella had obtained a disk with 125 pretrial motions from the MultiCounty Public Defender. D.74-32:81; D.79-4:63. The motion in question was a verbatim copy of one filed in another capital case, *State v. Daniel Colwell*, D.97-7:11. The motion stated that the defendant in that case had killed for the express purpose of being executed by the state and waived the presentation of all mitigation evidence. Colwell's name within the motion was replaced by Cella with "the Defendant." D.55-4:313.

D.96-1:25 (emphasis added).[43]

Other than this clearly erroneous "finding," the state habeas court did not "find" that Nick did not want counsel to present mitigation evidence. It was plainly unreasonable within the meaning of § 2254(d) for the state supreme Court to discard 25 pages of actual penalty phase factfindings consistent with the ultimate conclusion of the habeas court, and instead adopt as dispositive a single admittedly mistaken sentence based on evidence that was never in the record. No reasonable factfinder would find otherwise on this record.

Supreme Court law is clear that even a single unreasonable factual determination is sufficient to satisfy § 2254(d)(2). *Wiggins*, 539 U.S. 510, 528 (2003) (where state court "based its conclusion, in part, on a clear factual error" unsupported by the record, "[t]his partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision."); *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005)(state court conclusion that juror strikes were not race-based was unreasonable where the state court ignored evidence of the prosecutor's failure to strike similarly situated "favorable" jurors). *See also Brumfield v. Cain*, 576 U.S. 305, 313 (2015), where the Court pointed to two of the state court's "critical

---

[43]    The citation, "("MHT, 4/9/04, pp. 31-32)" was to the pretrial hearing where the motion was discussed and withdrawn.

factual determinations" as being inconsistent with the record and therefore unreasonable under § 2254(d)(2).

The single sentence is indispensable to the state supreme court's reversal: without the clause about mitigation, there is nothing in the habeas court's order on which to base the application of *Landrigan*. The state supreme court admits this, calling the mistaken sentence essential. *See Tate* at 210 ("factual findings that Tate did not want trial counsel to present mitigation evidence and that he wanted to receive the death penalty *are pivotal* … because in order for *Landrigan* to be applicable the record must establish that [Tate] clearly and unequivocally expressed" his intent not to present any mitigating evidence.") (emphasis added).

This Court "is not bound to defer to unreasonably found facts or to the legal conclusions that flow from them." *Cooper*, 646 F.3d at 1353 (finding state court's "great exaggeration" of testimony *in the record* qualified as an unreasonable determination of the facts). If a state court's "great exaggeration" of testimony in the record qualifies as an unreasonable determination of the facts, then a state court's reliance on a "factfinding" based on evidence not in the record at all, certainly does.

The rejection of the habeas court's actual factfindings here in deference to a clearly erroneous mistake is the kind of "extreme malfunction in the state criminal justice system…" that § 2254 is meant to guard against. *Harrington v. Richter,* 562 U.S. 86, 102 (2011).

### c. The unreasonable application of *Landrigan* rests on a false conflation:  Client wanting the death penalty is not forbidding mitigation

The state supreme court did not acknowledge anything peculiar in the extra-record provenance of the "pivotal factfinding," or its puzzling appearance in a section of the order unrelated to the penalty phase mitigation discussion and factfindings, or that it was irreconcilable with the habeas court's penalty phase holding.[44]   Instead, the court unreasonably characterized the issue as merely involving an erroneous *citation* that "does not support" the "factfinding."  It then wrote that "a habeas court's factual findings cannot be found to be clearly erroneous if there is evidence in the record to support [them]," (citations omitted), *Tate* at 210, and proceeded to comb the record for such support.   To do so, the court conflated two very different things:   Nick's remorseful desire to subject himself to the possibility of a death sentence and a directive that he did not want mitigation presented.

Specifically, the state supreme court highlighted counsel's statements that Nick was not enthusiastic about his case once he became religious and penitent, *i.e.*, his *attitude*.  In so doing, it ignored plain and repeated record evidence about his *actions*: that he *did not* forbid anything other than his

---

[44]    The state court wrote only that there was "a conflict between the habeas court's factual findings and its legal analysis," but that was because the habeas court had applied *Strickland* "without also considering" *Landrigan*.  *Tate* at 209.

brother Curtis and mother. It then equated counsel's testimony about Nick's directives not to involve these two family members to mean he had curtailed all mitigation.

For example, the court states that "at the guilty plea hearing, Tate clearly explained the rationale behind his desire for the death penalty, and Cella reminded the trial court in closing argument at the sentencing trial that Tate wanted the death penalty …" *Tate* at 213. But what Nick actually said was that he would accept whatever sentence the court deemed appropriate, whether death, life, or life without parole. "I have to live with the sentence that you give me." D.74-36:216. "What I believe I should get is one thing, and what I get is another." *Id*. at 221-22. None of this is a "clear[] and unequivocal[] express[ion] not to present any mitigating evidence." *Tate* at 210 (citing *Landrigan*).

And Cella did not say that Nick "wanted the death penalty." The opposite is true. Nick had

> said he deserved the death penalty for what he did. *He did not say "I want the death penalty*." …

D.64-12:101. (emphasis added).

In lieu of evidence that Nick actually curtailed mitigation, the state supreme court also argues that Nick's preference for a death sentence "indicated that he 'would not have consented to the presentation of mitigating evidence whose only purpose was to convince the jury to recommend life.'" *Tate* at 213, quoting *Cummings v Sec'y*, 588 F.3d 1331,

69

1336 (11th Cir. 2009). But in *Cummings*, this Court found the defendant "clearly, consistently, and adamantly insisted that he wanted no mitigation," and so instructed counsel and the court repeatedly. 588 F.3d at 1361. Cummings "did not want mitigation because he preferred the death penalty to life in prison," but it was his adamance in forbidding mitigation, not his preference for the death penalty, that made *Landrigan* applicable to his case.

And the other cases that the state supreme court cites to support its application of *Landrigan* here are inapposite. As in *Landrigan*, each "emphasize[s] the blanket nature of petitioner's prohibition on and obstruction of the presentation of mitigation evidence." *Lang v. Cullen*, 725 F.Supp.2d 925, 1057 (D.C. Cal. 2010). Each is clearly distinguishable from Nick's.[45] The state supreme court cites *Loden v. McCarty*, 778 F.3d 484, 500

---

[45]     *See, e.g. Allen v. Sec'y*, 611 F.3d 740 (11th Cir. 2010)(application of *Landrigan* not unreasonable where counsel was following the defendant's explicit instructions, made "over and over," directing him not to present "any and all mitigation," the defendant so informed the court in a pretrial waiver, and memorialized his instructions in a sworn document which also set forth his understanding of his actions and the consequences); *Krawczuk v. Sec'y*, 873 F.3d 1273, 1296 (11th Cir. 2017)(defendant pled guilty, affirmatively dismissed a motion for funds to hire a mitigation investigator, "clearly communicated" his desire not to present mitigation at a plea hearing, affirmed he did not want to present any mitigating evidence at three separate proceedings, reiterated in a colloquy prior to jury selection he did not want counsel to participate in any part of the penalty phase trial, and refused to allow a pretrial

(5th Cir. 2015) to claim that even if Tate's "instructions" were not as "strident, public or obstructive as those in *Landrigan*, the record here evidences something more resolute than a mere instruction not to present mitigation evidence." But *there was no instruction* at all here. And Tate's case is completely at odds with *Loden*, where, in addition to instructions not to put on a mitigation case, the defendant instructed counsel not to object to evidence and not cross-examine the state's penalty witnesses or make closing argument, "lending support to an inference that Loden's decision not to present a mitigation case was firm." 778 F.3d at 500.

Despite contorting the factual record to fit the *Landrigan* paradigm, the state supreme court could not point to a single instance in the record to show where Nick forbade the presentation of mitigation. By conflating Nick's oft-stated contrition with the forbidding of mitigation, the state supreme court unreasonably determined the record evidence and misapplied precedent.

---

competency report which discussed his background to be presented); *Cummings, ibid*. at 1361. *See also Taylor v. Horn*, 504 F.3d 416, 421-22 (3d Cir. 2007)(at guilty plea hearing petitioner agreed with counsel's statement he had instructed them not to contact or call witnesses and at sentencing told the court he declined to present any mitigating evidence; he also personally called potential witnesses to tell them not to attend sentencing).

71

### d. Counsel's consistent testimony: No instruction "ever" not to present mitigation and *Strickland*, not *Landrigan*, applies

Instead of confronting the many instances of record testimony by counsel that all Nick limited was evidence from Curtis and his mother, the state supreme court asserts that "several instances" of that testimony actually "describe[s] Mr. Tate's attitude early in his case before he had a change in attitude or on counsel's testimony before their memories were refreshed as to what actually occurred" at trial. *Tate* at 212.   The trial record is the best evidence of "what actually occurred," and counsel's testimony about what happened at trial was not limited to early in the case.

Tate "spent four years in jail *getting ready for trial*" according to Cella. D.74-32:75 (emphasis added).  His "change of attitude" only manifested in August of 2005, two months prior to trial, when the case was assigned to a new judge following more than a year's delay in the proceedings.  And his "attitude" was remorse, with the resulting desire to plead guilty and expose himself to the death penalty.  It was not to affirmatively curtail the investigation and presentation of mitigation.

 The record shows that at a pretrial hearing the month before trial, Cella discussed putting sentencing phase witnesses on call and affirmed he would be prepared to present evidence during the sentencing phase.  D.61-8:35-40.  Nick did not contest this.

Still closer to trial, on September 30, 2005, Cella informed the court that he had located and interviewed all mitigation witnesses, D.61-9:6, and Nick assured the court that he had no problems with counsel. *Id*. at 21. On October 21, 2005, *three days before trial*, the court again reminded counsel of the need to locate and interview all mitigation witnesses, D.62-1:4-5, and Nick again affirmed his satisfaction with trial preparations. *Id*. at 21. He signed releases to obtain his privileged NGRH records the week before trial. D.79-4:188. He said nothing about not wanting to present mitigation. Cf. *Landrigan*, 550 U.S. 465, 476-77 (the defendant stated on the record at trial he had instructed his lawyers not to present mitigation. He then "interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating.").

At the guilty plea on November 15, Cella talked about the mitigation he was considering presenting – Dustin's influence, and Nick's drug use. Not only did Nick *not* tell the court he did not want mitigation, he freely discussed the very topics counsel just identified as mitigation. He offered to undergo another mental health evaluation, D.74-36:212. He told the court about the subservient relationship with Dustin, *id*. at 210, and Dustin's "order" to kill Chrissie. *Id*. at 206. He discussed his drug use in the weeks and hours prior to the crime. *Id*. at 217. He again proclaimed satisfaction with counsel, D.74-36:211, and when counsel told the court there would be more evidence about Nick's relationship with Dustin at the sentencing trial, *i.e.* more mitigation, Nick did not comment, correct him, or

73

tell the court it should not consider it. *Id.* at 212.  Cf. *Landrigan*, 550 U.S. at 476-77.

The record supports the habeas court's determination and Cella's testimony that Nick's directives regarding mitigation were limited to the testimony of Curtis and his mother *throughout* the case.  "Other than the Curtis stuff" Nick *never* objected to counsel presenting or calling witnesses. D.81-1:58. He did not "*ever* tell [counsel] not to talk to any of his family members [or] friends.  D.81-1:42. (emphasis added).

The state supreme court claims the habeas court erred in finding counsel ineffective "without considering *Landrigan* or related cases," *Tate* at 209, but its order shows the habeas court did:  it considered the question of Nick's directives to counsel, found they were limited to Curtis and the mother, and found this did not excuse counsel's failure to investigate and present the overwhelming, available mitigation presented in the habeas proceedings. D.96-1:54. It properly analyzed the case under *Strickland*.

74

### e. Post hoc complaints by petitioner and "somewhat unclear" statements by counsel four years after trial do not change the facts at trial

The 2009 motion for new trial hearing remains the only instance the state court can point to where Nick said anything about not wanting any mitigation.[46] *Tate* at 212.

In this first, only, and four-years-late assertion to the trial court, Nick complained that Cella had not liked him, had argued with him over pleading guilty, and had refused to listen to him. He then claimed he had "wanted to just leave out any mitigating evidence and all" at the actual trial, in 2005. "And I have only recently come across the actual law cases, you know, with my limited reading skills and limited knowledge in the law. I did not know that it was right that I could just forego all of this." D.74-36:234-35.

If Nick did not know "until recently" that he had the right to forego all mitigation, he could hardly have demanded that right at trial. And, it is completely at odds with his actual statements at trial. At his guilty plea two weeks before trial, Nick stated he had no problem with either of his attorneys, that he had the "highest respect" for them, that they had "advised me and helped me out" and that they had gone "above and

---

[46] The state court's insistence that Nick's "own statements in the trial proceedings," *Tate* at 211, show that he had directed counsel not to present any mitigation, is clearly erroneous.

beyond" in representing him.  D.82-2:263-64.  He said that he and his attorneys "did not agree on a lot of things" but had meetings and that Cella had come to the jail "and he said whatever I think was best, you know."  D.82-2:262-263.  Again, he did not object or comment when Cella told the court that he would be presenting information at the sentencing trial about Dustin's influence over Nick, *i.e.,* mitigation.  Instead he told the court he wished to proceed with a bench trial. "I have to live with the sentence you give me."  *Id.* at 268.

Faced with post-trial testimony which contradicts the contemporaneous trial record, the proper focus is on the record evidence.  *See Lee v. United States,* 582 U.S. 357, 368 (2017)("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.").[47]  *See also Harding v. United States,* 2024 WL 490839 (11th Cir. 2024)(not reported)(in context of plea, "[t]he defendant's own conclusory after-the-fact assertion that he would have accepted a

---

[47]    "[S]worn statements made in open court are entitled to a strong presumption of truthfulness."  *United States v. Lumpaziante,* 251 F.3d 519, 524 (5th Cir. 2001), citing *Blackledge v. Allison,* 431 U.S. 63, 74 (1977). A defendant "will not be permitted to contradict testimony given under oath at arraignment and sentencing."  *Duke v. United States,* 2021 WL 6339550 (5th Cir. 2021).

guilty plea, without more, is insufficient to satisfy the first prong of the prejudice test.").

The state supreme court claims that at the same 2009 hearing, co-counsel Reed "corroborated" Nick's claim he had "wanted to just leave out any mitigation evidence at all." *Tate* at 212. The court quotes Reed as saying flatly "[Mr. Tate] told me and Mr. Cella at trial to leave out all mitigating evidence." *Id.*, quoting D.82-2:227. The quote is incomplete and excludes context. Reed was (inaccurately) paraphrasing Nick's words, and taking issue with them, not affirmatively stating that Nick told counsel not to do something:

> Judge, I'm just concerned about what's taking place. *I mean, I was in the trial*, and I understand ... – *as to what's being said today by Mr. Tate* that I've lied to him, that I've perverted something. …
>
> [*Mr. Tate] also said – he told me and Mr. Cella at trial to leave out all mitigating evidence.* But I had conversations with Mr. Tate subsequent to the trial, and he and I talked about other things differently than (sic) – that he did express some concern about what did go on at trial.

*Id.* at 226-227 (emphasis added)

In fact, Nick had not said that he "*told counsel* at trial to leave out all mitigation." He said that he "*had wanted to* just leave out any mitigating evidence" but did not know that he could. The state supreme court admitted that "the meaning of Reed's statement is somewhat unclear" – a far cry from the unambiguous testimony required by *Landrigan*. *Tate* at

77

210.  It nevertheless improperly relied on it.  It further claimed that Reed

"affirmed" at his deposition and in his hearing testimony that Tate had told

counsel to leave out "all mitigating evidence."  *Tate* at n.10.  The record

shows the opposite: at the deposition Reed testified Nick had *not* told

counsel that they could not use certain evidence.  Instead, Reed said "*I

know [Mr. Tate] didn't say, don't want to use.*"  D.81-1:112.  He did not

remember ever being told not to talk to any witnesses, D.81-1:120, or

present anyone but Curtis and his mother.

> Q (By Counsel for Respondent): So, is it fair to say that [Oswald
> Tate and Cyril Watnes] are the two witnesses that Petitioner
> would allow you to call?
>
> A: I wouldn't agree with that.

D.74-33:81.

And Reed stated in his affidavit, which he reaffirmed at the

evidentiary hearing at Respondent's behest, D.74-33:92, that he believed

counsel "should have gone forward and presented" live testimony

regarding molestation by Curtis; if they had "I do not think Nick would

have stopped us."  D.74-35:35.

Reed's affidavit directly addresses the mitigation issue.  It does not

say that Nick told counsel he did not want any mitigation presented.  It

says he did not want his mother or Curtis to testify.  The state supreme

court does not mention this.  *See also* D.74-35:39.

78

As testified to repeatedly by Cella, Nick's disagreement with counsel was not about mitigation but his desire to expose himself to the death penalty. D.81-1:31(only disagreement was about Nick wanting the death penalty); D.81-1:42 (the only disagreement with their client was "about what [Mr. Tate's] goal should be," *not about whether to present mitigation*); D.74-32:74 (Cella testifying there were no other witnesses in the mitigation investigation Tate did not want counsel to talk to); D.81-1:120 (Reed did not remember Nick ever telling him not to talk to any witnesses.)

"[S]elf-serving, *post hoc* assertions" that he would have declined to present mitigation but for counsel's purported nefariousness cannot trump what the "contemporaneous evidence" in the trial record makes clear. *Duke v. United States*, 2021 WL 6339550 (U.S. Dist. Ct. N.D. Texas, 2021) That record shows no instruction not to present mitigation much less

"clear,"[48] "unmistakable"[49] "resolute"[50] "continuous"[51] "repeated"[52] "steadfast"[53] "dogged"[54] opposition required by *Landrigan*.

On the record before this Court, no reasonable jurist would find that the lower court's extrapolation of a clearly erroneous "factfinding" from extra-record evidence, and its ensuing misapplication of *Landrigan* to Nick's case, to be reasonable. The record shows that counsel did not investigate and develop mitigation, not that Nick would not allow it.[55]

---

[48]     *Cummings*, 588 F.3d at 1361.

[49]     *Krawczuk*, 873 F.3d at 1299.

[50]     *Loden*, 778 F.3d at 500.

[51]     *Lang*, 725 F.Supp.2d at 1057.

[52]     *Id.*

[53]     *Allen*, 611 F.3d at 763.

[54]     *Blystone*, 664 F.3d at 424.

[55]     The state court also claims Nick's actions post-trial supports its conclusions that "his instructions were fixed and unyielding at the time of trial." Tate at 214.  Nick's post-trial actions, in which he vacillated about his appeal, have no relevance to any directive he may or may not have issued regarding the presentation of mitigation at trial. This is another objectively unreasonable determination of the facts. § 2254(d)(2).

80

**f.    The reason counsel's post-trial testimony was "somewhat unclear" and "at odds with other testimony and evidence" was because counsel did not investigate and did not know the extent of the mitigation**

Counsel believed the evidence of the childhood rapes by Curtis to be so powerful they did not by their own admission investigate further. *See* D.79-5:10-14, 34. Because they did not know about mitigation other than this, to which "everything else paled in significance," D.74-32:71, in several instances they testified using the term "mitigation" as a shorthand for Curtis's sexual molestation – the mitigation that Nick plainly did not want his brother to testify about. By omitting key testimony and misrepresenting what was actually said, the state supreme court conflated "mitigation" with the evidence of childhood sexual abuse.

At his deposition, Reed's "information of things going on in the household through the years" were "lack of education, sexual abuse … attendance was an issue." D.81-1:118. He testified similarly at the evidentiary hearing. "The home in which he was brought up in was not conducive to what maybe any of us in this room had experienced." D.74-33:44. "Education or lack thereof really" was a problem, D.74-33:44; the "mitigation theory" was "childhood background, lack of education, no parenting, basically it's the three boys stuck together, it seemed like." He went on

81

[T]hey basically raised themselves and, as a result, they did, the drugs were rampant, I think in the family and obviously child abuse. His own brother molested him.

D.74-33:65.

In asserting that counsel actually knew about the horrific abuse in this case, the state supreme court materially altered this testimony in its opinion. The court quoted Reed as having "considered a mitigation strategy that included "[Tate]'s childhood background, lack of education, no parenting, … rampant [drug use], … child abuse[, and h]is own brother['s] molest[ation] of him." *Tate* at 218. Quoting the testimony this way – "child abuse[, and h]is own brother['s] molest[ation] of him" – with brackets and an added word and letter, makes molestation appear to be a separate thing from child abuse and materially changes the meaning. No reasonable factfinder would read the testimony this way. This unreasonableness is highlighted by the fact that when asked specifically about abuse, Reed did not "remember if we talked about that or not. We could have, I just don't remember." D.81-1:117, D.74-33:46.

Reed testified he did not discuss Nick's background with his parents because Reed did not want to criticize their parenting, which he described as "you didn't take your kid to school and your kid dropped out in whatever grade." D.74-33:96. Cella also could recall no discussions of physical abuse with Nick. D.74-34:213. "I couldn't repeat any stories, no."

82

D.74-32:71.[56]  Reed's paralegal Rachele McKenzie also testified that counsel "did not investigate other abuse in the family so nothing like that would have been used."  D.74-35:39.[57]  Molestation is what counsel knew about, not the universe of mitigation introduced in the habeas court.

Reed elaborated that counsel had wanted to call Curtis and the mother, but Nick did not want them to testify "because of the sensitivity of it and putting his brother on the stand."  D.74-33:66.[58]  In an ensuing exchange, the habeas court characterized this as "your comment about him not wanting to call mitigation witnesses," although Reed's testimony was limited to Curtis and the mother.  Reed went on to discuss for the next two transcript pages how Tate's religious beliefs that made him believe "he had

---

[56]   The state court's assertion that counsel testified that "they talked to Tate about sexual and physical abuse in his family and that Tate did not want to present this type of evidence" *Tate* at 219, is clearly erroneous.

[57]   Her testimony, by affidavit and at the hearing, went unmentioned by the state court.

[58]   Reed said "we had had those discussions, to call Curtis, his mom, Dr. Richards, primarily the mental aspects and the sexual abuse aspects of the case." *Id.*  Cella, in charge of mitigation, testified that Dr. Richards was not called because it was not the "main thrust" of his mitigation case.  D.74-32:94. Nick did not care about whether Dr. Richards testified, D.74-32:109. Cella contemplated using Dr. Richards only to address Mr. Tate's substance addiction and Dustin's control over him (both subjects Mr. Tate discussed with the court at the guilty plea).

committed a sin worthy of death and he wanted to die," not that Nick did not want to call mitigation witnesses.  After that there was this exchange:

> REED: Right.    And his childhood was terrible, a terrible childhood, so ---
>
> THE COURT: No question about any of that, but he –
>
> REED: No question.
>
> THE COURT: None of that could come out?
>
> REED: Right.  Because of the religious –

D.74-33:71.

In interpreting counsel's testimony to mean Nick forbade counsel from presenting all mitigation, the state supreme court again materially alters it.  Reed believed Tate's childhood was terrible because of the sexual abuse by Curtis and that was what "could [not] come out."  But the state court changed the habeas judge's question:

> THE COURT: None of [the mitigating evidence that trial counsel wanted to present] could come out?
>
> A: Right.  Because of the religious --

*Tate* at 210.  (brackets in original).  The bracketed addition misleadingly broadens the scope of Reed's reference.  In stretching Reed's testimony to encompass not just childhood but "all" mitigation, the state supreme court affirmatively changed it.  The habeas court continued:

> THE COURT: And I presume that based on client confidence, you couldn't even express that to the Court either?  You're sort of stuck, right?

84

REED:  Our hands were tied, basically.

THE COURT:  Okay.

REED:  It made it very difficult to do that, present the evidence…

D.74-33:71. The state supreme court says counsel's testimony was that "[their] hands were tied with regard to presenting mitigation evidence." *Tate* at 216.  Reed is referring to it being difficult to present the evidence of Curtis's sexual predation, not that it was impossible to present mitigation. It was difficult to present the evidence, but they did so by submitting the police records in Curtis's case and notecards the mother had sent to Nick.[59]

And if Nick indeed forbade all mitigation, Cella would have so testified.  Cella was expansive below about how his client was adamant about not wanting him to "talk about the anal rape."  D.74-32:72. Surely if Nick had forbidden all mitigation, Cella would have been equally forthright.  Instead, he "[couldn't] recall anything else that [Tate] specifically ordered me not to pursue."  *Cf. Tate* at 218.   And the idea that client confidence "tied [counsel's] hands" and kept them from telling the trial court that their client would not allow them to present any mitigation, *i.e.* do their job, is nonsensical.  They affirmatively told the court how they *would be* presenting mitigation at the sentencing.  D.74-36:212.  *Cf. Landrigan*

---

[59]    *See Young v. Sirmons*, 551 F.3d 942 (10th Cir. 2008)(no mitigation waiver where defendant forewent testimony from family members and friends but introduced it through stipulation).

at 469 (noting defendant's colloquy with the court that he did not want to present mitigation).

Reed's further testimony was clear that Nick was not enthusiastic but did not forbid mental health testimony:

> A: It's been so long ago, it's hard to tell you but I know that issues, the psychological issues, came up but I don't know to what extent. … – I did not get involved in that aspect of it.
>
> Q: Just for clarification, he did not want any psychological evidence presented?
>
> A: Again, *this is my words*. *I know he didn't say, don't* want to use. Basically he did not want to really put anything up.

D.81-1:112 (emphasis added). Reed's words, not Nick's. This is the fatalistic client, as in *Porter*. It does not approach the "actively obstructive" defendant in *Rompilla*, and is far from the adamant and overt refusal to present mitigation required by *Landrigan*.[60] The state supreme court omits that trial counsel's testimony as a whole repeatedly contradicts the premise that Nick forbade all mitigation.

---

[60] The state supreme court similarly conflated Cella's testimony. It said that Cella "affirmed that Tate did not want counsel to even investigate mitigation evidence" but "wanted to just go straight to death row," and did not even want a trial. *Tate* at 210. In fact, what Cella "affirmed" was that Tate did not want "that particular aspect" of mitigation, i.e. Curtis, to be investigated. D.81-1:41. And he did not see any need to investigate it: "This was a case where he went to prison so there were police reports and a guilty plea. There wasn't much to investigate, really." D.81-1:41-42.

"The fact that [Nick] chose to forego the presentation of his own testimony and that of [] two family members … simply does not permit the inference that, had counsel competently investigated and developed expert mental health evidence and institutional records, [he] would have also declined their presentation." *Blystone v. Horn* 664 F.3d 397, 424-26 (3d Cir. 2011). The state court's determination otherwise was objectively unreasonable in light of the evidence before it.

> g.    **"It's an overwhelming case in mitigation": Mitigation was presented and *Landrigan* does not apply**

The state supreme court itself recited the extensive presentation of mitigation in this case. *Tate* at 209.    In addition to presenting the testimony of Nick's father Oswald and the jailhouse preacher Cyril Watnes,

> During closing argument, trial counsel stated that they disagreed with Tate's belief that the death penalty was the appropriate punishment, repeated Tate's description to the trial court during the plea hearing 'that he was responding to what he called an order from Dustin' and that he would do anything 'that pleased [Dustin],' reminded the court of Tate's involvement with drugs and his statement to the trial court at the guilty plea hearing that he did not want to use drugs as an excuse, stated that Tate was remorseful and had accepted responsibility, and pointed out that Tate had no criminal history. Trial counsel also argued the unplanned nature of the crimes, Tate's surprise on finding the children at the home, the kidnapping victim's testimony indicating that Tate protected her from his brothers, Tate's peaceful surrender to and cooperation with the authorities, and the fact that Tate's genuine rehabilitation could be useful in that 'others in society c[ould] learn and benefit from his story.'

87

Counsel argued that Tate had taken responsibility for his role in the crimes and that the punishment should be 'in proportion to the individual's role,' that there was no evidence that Tate murdered Katelyn Williams, that all three co-defendant brothers said that Chad Tate killed her but that he was not eligible for the death penalty because of his age, and that both of Tate's co-defendant brothers had accepted negotiated pleas in exchange for life sentences. Counsel asked for mercy and compassion and argued that a life sentence was appropriate. Trial counsel submitted correspondence to Tate from his mother and Dustin Tate and Curtis Tate's certified conviction for the molestation of Tate but did not refer to these exhibits in any way."

*Tate* at 208-09.

Cella told the trial court, "Judge, you add up all these things and it's an overwhelming case in mitigation, that overwhelming[ly] suggests that a life sentence is appropriate in Nick's case." D.64-12:119. Counsel testified in habeas that other than more on the Curtis sexual abuse evidence, he had presented the mitigation case that he believed would result in a life sentence. Counsel chose this theory of mitigation "because I thought it would work." D.74-32:109.

All of these actions by defense counsel were part of an open, frank, and straightforward public effort to obtain a life sentence for Nick. [61] Nick did not say a word in protest, "undermin[ing] the position that Petitioner

---

[61]     *See Stankewitz v. Wong*, 698 F.3d 1163, 1180 (9th Cir. 2012)(despite alleged objection to presentation of mitigation, where a defendant does not interrupt or try to sabotage trial counsel's presentation, *Landrigan* is inapposite).

had instructed his counsel not to present mitigation evidence." *Coleman v. Mitchell*, 268 F.3d 417, 447 (6th Cir. 2001) (in light of closing argument and lack of clear expression of such preference, record did not support that petitioner instructed counsel not to present mitigation); *see also Rega v. Wetzel*, 2018 WL 897126 (W.D. Pa., 2018)(differentiating *Landrigan* where defendant "did permit his counsel to make a case for a life sentence and did allow them to present some mitigating evidence.")

Additionally, the prosecutor argued at sentencing that Nick had lied in pleading guilty to child molestation because he wanted the death penalty and knew "there was no death case" without the child's murder. In response, Cella told the court that Nick had "told you he thinks he should get the death penalty … he's not willing to lie to you … to get the death penalty.  That's not what his statement to you was.  He said he deserved the death penalty for what he did.  He did not say 'I want the death penalty.'  *And I've had several discussions with him about that.*"  D.64-12:101.

Again, Nick said nothing.  If counsel was misrepresenting his directives, Nick was not afraid to tell the trial court what was on his mind, as shown in the guilty plea colloquy.  *See Landrigan* at 479 (defendant's "propensity for interjecting himself into the proceedings" meant it was "doubtful he would have sat idly by while his counsel lied."); *Fry v. Shoop*, 124 F.4th 1019, 1026 (6th Cir. 2025)(defendant's "'strong-willed and

outspoken' attitude during the rest of the [proceedings] belied the notion" that he kept quiet while counsel made an extensive mitigation argument.). Nick's goal was to accept a death sentence if that was the verdict, but he did not forbid the wholesale presentation of mitigation in furtherance of that goal and if mitigation resulted in a life sentence he would "live with" it. The distinction underlies the court's mistaken insistence that Tate's case is governed by *Landrigan*. *See Tate* at 210 ("for *Landrigan* to be applicable to Tate's case, the record must establish that the defendant clearly and unequivocally expressed" his intent.) The lower court's repeated conflation of the two is an unreasonable determination of the facts in light of the record evidence, and an application of the law that is contrary to *Strickland, Rompilla* and *Porter*. § 2254(d).

### D. The sentencing court never heard the overwhelming mitigation, and as properly found by the habeas court, petitioner was prejudiced under *Strickland*

The evidence presented in the habeas proceedings was staggering, a "tidal wave of information … with regard to mitigation." *Andrus*, 590 U.S. at 810.

All of it was persuasive, powerful, and classic mitigation evidence like that which the Supreme Court has repeatedly held establishes prejudice in even the most aggravated cases. [62] "Evidence of childhood

---

[62]    *Andrus*, 590 U.S. at 810, *Sears v. Upton*, 561 U.S. 945, 949-59 (2010); *Porter*, 558 U.S. at 43-44; *Rompilla*, 545 U.S. at 388-90.

90

abuse and privation, sexual molestation and repeated rape, and physical torment, reflect "the type of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins*, *supra*, 539 U.S. at 535, and "might well have influenced the [court's] appraisal of his moral culpability." *Williams*, 529 U.S. at 398. The mitigating evidence in Nick's case is equally if not more extreme than those cases. It is also unrebutted. The "description, details, and depth of abuse in [Nick's] background that were brought to light" in the state habeas evidentiary hearing "far exceeded what the [trial court] was told." *Johnson v. Dept. of Corr.*, 643 F.3d 907, 936 (11th Cir. 2011).

A competent expert, given the background information, would have been able to testify that Nick's symptoms and behaviors resulted from extreme trauma. They could have testified, as did Dr. Bradley, that such trauma causes changes in the brain, D.74-34:57 and causes impaired ability to make decisions, control impulses, and to think clearly. This evidence of Nick's mental illness and brain damage, also unrebutted, likewise "might well have influenced the [sentencer's] appraisal of his moral culpability" *Williams v. Taylor, supra* at 398, and could reasonably have formed the basis for a life sentence. *Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002); *Baxter*

*v. Thomas*, 45 F.3d 1501 (11th Cir. 1995).[63]  Evidence of brain damage "may have particular salience for a [judge] evaluating [a defendant's] behavior." *Porter*, 558 U.S. at 43.  But "[a]s far as the [judge] knew, [Mr. Tate] did not suffer from brain damage; his emotional stability, impulse control and judgment were perfectly normal; he could plan and understand the consequences of his actions as easily as the next person.  The [judge] labored under a profoundly misleading picture of [his] moral culpability because the most important mitigation circumstances were completely withheld."  *Ferrell*, 640 F.3d at 1236.  The failure "to investigate this issue at all or to present any of this evidence seriously undermines [] confidence in the application of the death sentence."  *Brownlee*, 306 F.3d at 1074.

The trial judge here also did not know that Nick's childhood experiences and background led to his drug use, or how drugs interacted with his brain impairments.  While he heard that Nick used a lot of drugs that day, the court heard no evidence of the overwhelming trauma and genetic predisposition that led Nick to begin abusing.  D.81-3:256, D.74-34:114-116.  He did not hear, as Respondent's expert Dr. Norman concluded, that the crime itself was "the result of his drug dependency and usage, and his compromised abilities to cope with the circumstances."D.74-

---

[63]    "Significant brain damage," means Mr. Tate has "trouble conforming [his] behavior appropriately where a situation change[s] in an unanticipated manner," *Tate* at 220.

34:217.  *See also* D.82-4:10-11.   He heard about it only from Nick at the plea colloquy and considered it only in the context of knowing right from wrong in taking Nick's guilty plea.  D.82-2:270.[64]   Dr. Richards or another qualified expert could have explained that Nick began abusing drugs and alcohol as *a direct result* of the overwhelming trauma in his life – a far different argument and strong mitigation.   D.81-3:256; D.74-36:138.  The drug use here was extreme.

Asked by Respondent's counsel what he would have told the judge had he testified at Nick's sentencing in 2005, Dr. Bradley testified,

> I would say that I think anyone who's making a decision about this case needs to understand that Nicholas Tate and his brothers experienced incredibly pervasive and extreme amount of abuse and neglect from multiple locations across the course of their childhood.

> And that this clearly negatively impacted them, both biologically and psychologically, leaving them, really compromised and that in the face of all that, in fact, Mr. Nicholas Tate appears to have tried to make a good go of doing his best as he could of working, of trying to help out his dad, of trying to help out his mom.

---

[64]   In this limited context what he heard could be considered aggravating.  *See Cooper v. Sec'y, Dept. of Corr.*, 646 F.3d at 1355 (acknowledging that evidence of alcoholism and drug abuse can be "a two-edged sword" but crediting evidence of alcohol abuse beginning at age 11 as mitigation "as it was used as a way to escape his horrible background").

And none of this excuses the crime or takes away the horribleness of it, and that's not my point. But in order to understand both the individuals up until that point and their histories, is very important. And to also understand, you know, how they may have been thinking or making decisions on the day of the crime.

D.81-2:88.

This is exceptionally poignant and powerful mitigation. Counsel's failures meant the sentencing court heard none of it.

The "proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of [Petitioner's] 'significant' mental and psychological impairments, along with the mitigation evidence introduced during [the] penalty phase trial, to assess whether there is a reasonable probability that [Petitioner] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Sears*, 561 U.S. at 956.

As seen *supra*, counsel's own "overwhelming" mitigation case included evidence of rehabilitation, remorse, acceptance of responsibility and good behavior that was considerable, as acknowledged by the Georgia Supreme Court. *Tate* at 209. None of the mitigation of Nick's horrific, traumatic background or mental illness and impaired brain would have been inconsistent with the arguments counsel ultimately propounded.

94

None of it would have opened the door to bad evidence. *Debruce*, 758 F.3d at 1278.[65]

When this Court weighs the evidence together, the case for a life sentence is compelling. "[T]he state trial judge was correct both in his recognition of the established legal standard for determining counsel's effectiveness, and in his conclusion that the entire post-conviction record, viewed as a whole and cumulative of mitigation evidence presented originally, [which] raised 'a reasonable probability that the result of the sentencing proceeding would have been different. …"). *Williams*, 529 U.S. at 398-99.

This court should conduct *de novo* review, apply *Strickland*, and grant relief.

### E. The state supreme court's "prejudice" analysis is an unreasonable application of clearly established federal law

Although it applied *Landrigan* and therefore did not analyze *Strickland* prejudice, or engage with the effect of the additional mitigating evidence presented in habeas, the state supreme court also added an additional requirement to prove prejudice, not derived from *Landrigan*, to Nick's case. According to the state supreme court, in order to show prejudice Nick must first show that if "advised more fully [he] would have

---

[65] And by the prosecutor's own averment, the aggravating evidence which made this a capital case was the death of Katelyn Williams, a crime actually committed by Chad Tate. *See* Argument II, *infra*.

authorized such evidence" like that presented in the habeas court. According to the court, only by making that showing can he then make the *Strickland* showing that the new evidence would have in reasonable probability changed the verdict.  *See Tate* at 215, citing *Krawczuk v. Sec'y*, 873 F.3d 1273 (2017) (asserting this two-part prejudice showing, first announced pre-*Landrigan* in *Gilreath v. Head*, 234 F.3d 547 (11th Cir. 2000), to be "consistent" with *Landrigan*.)[66]

The state court then claimed that counsel knew about all the evidence admitted in the habeas court and discussed it with Nick, and that Nick would not have allowed it to be presented. *Tate* at 216. It acknowledged that Landrigan does not require such a "knowing and informed" waiver. Nonetheless, the court grafted a knowing and informed requirement that it admits does not exist,[67] to an investigative standard found nowhere in *Landrigan*.   Nothing in *Landrigan* excuses counsel from conducting a comprehensive mitigation investigation.  *See Porter*, 558 U.S. at 40. [68]

---

[66]   This two-step prejudice analysis is not clearly established federal law. It does not derive from *Landrigan*, which does not concern performance.  *See also Williams v. Taylor*, 529 U.S. at 412.

[67]   *See Tate* at 215 ("if an informed and knowing waiver of mitigating evidence *were* constitutionally required ….")(emphasis in original).

[68]   In *Landrigan* "the Court was careful to distinguish the circumstances [] from those in *Rompilla* … [and] the Court thus reaffirmed the Court's earlier holdings that counsel has an affirmative duty to investigate for mitigating evidence when preparing for sentencing."

Because *Landrigan* does not apply here, this Court does not reach this alternative prejudice argument. § 2254(d).

### 1. Counsel did not know the vast majority of this evidence and so could not have discussed it with Nick

Even if clearly established federal law did require a knowing and informed waiver of mitigation, the record here shows trial counsel were not "aware of the vast majority" of the evidence presented in habeas, could therefore not have discussed it with their client as mitigation, and Nick could not possibly have understood the consequences of waiving it. *Cf. Tate* at 216. Since this is demonstrably true, the state court lowers the bar, claiming Nick needed only to have had a "general understanding" of the available mitigation in order to make a knowing and informed waiver of it.[69] *Tate* at 217, 220. To claim that Nick even knew the meaning of

---

*Gray v. Branker*, 529 F.3d at 232. *See also Sanders v. Davis*, 23 F.4th 966, 984 (9th Cir. 2022)(*Landrigan* concerned only *Strickland's* prejudice prong and did not change an attorney's obligation to conduct a mitigation investigation when a client objects to presenting a mitigation defense); *Blystone*, 664 F.3d at 422 ("[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.")(citing ABA Guidelines 11.4.1(c)).

[69] "A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973); Williams, 529 U.S. at 393

mitigation and his right to present it, the court asserts that Nick's statements at the guilty plea hearing and the 2009 motion for new trial hearing "demonstrate" he understood this right, but it recites only his 2009 testimony that the mitigation presented at trial "did not have no bearings on the case anyway, because the decision was still capital punishment." *Tate* at 216.  This cannot suffice to show Nick's understanding, in 2005, of mitigation like that presented in the habeas court.  And, if he understood it, and mitigation was presented, it means *Landrigan* does not apply.

### a.    Counsel did not know about childhood abuse and trauma other than child sexual abuse by Curtis

As shown, counsel simply did not know about and therefore could not have discussed with Nick any of his violent and traumatic childhood other than the Curtis sexual abuse.[70]  So, the state supreme court relies on exaggerated claims of what Dr. Richards knew about, extrapolates this purported knowledge to counsel via counsel's discussion with Richards

---

("constitutionally-protected right" to present mitigation); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Lockett v. Ohio*, 438 U.S. 586 (1978).

[70]  The court claims that counsel testified they "discussed with Tate his limited education, prior criminal history, sexual abuse, and physical abuse, particularly by his father." *Tate* at 218.  Nick's dropping out of school at age 13, the fact he had no criminal history, and the Curtis sexual abuse were known to counsel.  But counsel could not recall a single other instance of abuse, in a case that is singular in the extent and brutality of abuse.

about his competency reports, and concludes that Nick understood these things when counsel discussed the reports with him.[71]

Specifically, the state supreme court writes that Dr. Richards testified that Nick told him that "his mother's boyfriend abused him by putting a gun to his head, beating him with a belt, and making him stay on his knees for 24 to 36 hours at a time." *Tate* at 218. But Richards did not include this information in his competency report and counsel knew nothing about it. *See* D.74-33:62. *See also* D.81-1:29 (Cella "I don't recall [physical abuse] being a factor"); D.74-32:71 (Cella "expected" that he had discussed physical abuse with Petitioner, but he recalled none. "I couldn't repeat any stories, no."); D.74-33:62 (Reed testifying "I don't know [the mother's] boyfriend history prior to trial, or prior to me getting involved"); D.81-1:117 (Reed did not remember talking to Nick about physical abuse). It is undisputed counsel knew nothing of the horrific abuse at the hands of the mother, or the fraternal incest, all pieces of a childhood "as extreme as any" seven experts testified they had ever seen. *See* D.81-3:218 (Richards testifying he knew nothing about the abuse or neglect by Nick's mother). Counsel did not even know everything that *was* in Richards' report. Richards reported that Nick suffered sexual abuse at the hands of "multiple perpetrators," a fact repeated by the state supreme court. But

---

[71]    *See* n. 73, *infra*. Counsel did not discuss the 2005 report with Nick at all.

counsel did not investigate this, and did not know of Nick's abuse at the hands of his aunt's husband. The only sex abuse they knew about was Curtis.

The record simply does not support the state supreme court's exaggerated premise that counsel knew and discussed mitigation like that presented in the habeas court with their client even generally, much less that it constituted a "knowing and informed" waiver of that evidence. This is an unreasonable determination of the facts. § 2254(d)(2).

> **b.  Counsel did not know about and did not discuss "expert evidence of psychiatric background and mental disorders" like that presented in the habeas court**

It is further undisputed that counsel did not know what the state supreme court terms as "expert evidence of psychiatric background and mental disorders like that presented in the habeas court," and so could not possibly have discussed them with their brain-damaged client in order for him to make a "knowing and informed" waiver of presenting them.[72]

Thus, the court frames the issue as "what the record reflects regarding Tate's *general* understanding of the *availability* of such evidence as *possible* mitigating evidence," *Tate* at 220 (emphasis added).  It extrapolates this to mean that to which Dr. Richards could have testified.

---

[72]    The habeas court found as fact this expert mitigation testimony was available had counsel performed adequately and that Nick was prejudiced by their unreasonable omissions.

100

But again, the habeas evidence and what Dr. Richards knew about are utterly different. First, Dr. Richards found Nick did not have a "serious mental disorder." D.74-36:137. In his 2005 evaluation he found no "significant mental illness," as acknowledged by the court. *Tate* at 222. If Richards did not believe Nick had a serious mental disorder, he could hardly have known and discussed with counsel evidence of mental illness like that presented in the habeas court, and Nick could hardly have understood, even cursorily, "the availability" of this evidence.[73] Dr. Richards' 2005 report did conclude that Nick could "cooperat[e] in mounting a reasonable defense." D.1-30:3. If he could help mount a defense, he did not express to Dr. Richards any intent to bar all mitigation.

Richards could not have testified as the habeas experts did. He did not know the evidence underlying their expert opinions. D.74-34:210, 213-14. D.81-3:241. He did not have access to neuropsychological testing and so couldn't know Nick suffers from brain damage, although if he had been furnished the records recommending such testing he too would have done so. The state supreme court conspicuously fails to mention this.

Despite the state court's extensive rendition of Cella's discussions with the trial court regarding Richards, *Tate* at 220-221, what the record shows is that the only mitigating evidence counsel considered presenting

---

[73]    And Cella denied discussing the 2005 report and its "findings" with Nick. D.74-32:90. His billing records confirm this. *See* D.79-4:54.

101

through Dr. Richards was about Dustin's influence over Tate and drug use, as described *supra*. Richards himself affirmed this. D.81-3:234.

The court finally claims that regardless of what Richards knew, counsel had discussed presenting Richards' testimony with Nick, but he would not allow it. *Tate* at 222. It makes no sense that Nick would not allow Dr. Richards to testify about the same testimony – his drug use and Dustin – that he had already told the court about. D.74-36:216-218. And neither counsel so testified.[74]

### c. Counsel did not have the same evidence explaining Nick's drug use and dependency as presented to the habeas court and so could not have discussed it with him

Similarly, the state court treats the expert evidence adduced in the habeas proceedings regarding Nick's substance abuse as comparable to that known by Dr. Richards and claims counsel "were well aware of the vast majority" of the information before the habeas court. *Tate* at 223, but neither counsel nor Richards had the same evidence explaining the genetic predilection and etiology of Nick's drug use and dependency as presented

---

[74] *See* D.74-32:109 (Cella testifying that he did not think Nick had an opinion or "cared" about whether Richards testified or not); (D.74-32:94)("it was not the main thrust of [the mitigation])); D.74-32:104-05 ("[Dr. Richards] wasn't really central … where I was going with the strategy in the sentencing phase."); Reed did not recall ever talking to Dr. Richards, D.74-33:80, did not deal with Dr. Richards, D.74-33:64, and did not know why he did not testify.

to the habeas court, and so could not have discussed that mitigation with Nick. *See, e.g.,* D. 81-3:218.  Nor did they understand the constant trauma that fed his need to self-medicate.

Habeas expert Dr. Stewart addressed the causes of Nick's substance abuse and the related evidence in the records that counsel never obtained: hospital records documenting multiple overdoses involving large amounts of muscle relaxants and opioid painkillers, because of family trouble and depression, and ER assessment notes that "Patient shows no insight into seriousness of his act and is using prescription drugs as a means of coping with negative situation."  D.74-34:95.[75]

The state supreme court termed these 1998 records cited by Dr. Stewart to be "allegedly new habeas evidence" but it is undisputed counsel never got these records.  They did not have the Three Rivers records showing Nick sought professional help just eleven months before the crime for his crippling mental state. They did not speak to family members so did not know about the stressors he was facing trying to keep his dysfunctional family afloat.  They certainly did not know about brain damage, which the court admits was severe.  All of these things were driving his drug use, which in turn exacerbated his inability to function normally and his mental

---

[75]    By contrast, the state court minimized these records as reflecting simply "where he was treated for his pain pill overdose prior to his involuntary admission" to NGRH.  *Tate* at 222-23.

health.  *This* was the mitigating evidence presented in the habeas proceedings through Dr. Stewart, the available but unobtained records and the family testimony.   Because counsel didn't know all this, they couldn't discuss it with Nick, and all the trial court knew was Nick's understanding – he used a lot of drugs over many days.

Even if only a "general understanding" of available mitigation was all that sufficed for a defendant to waive his constitutional right to present mitigating evidence, the facts here do not approach meeting even that "standard."   There could not have been a knowing and informed waiver by Nick. The court's misapplication of *Landrigan* in the first place, and its conclusion that Nick made a knowing and informed waiver of his right to present any of the mitigating evidence presented below, are unreasonable applications of clearly established law and unreasonable determinations of the facts in light of the record evidence. § 2254(d)(1) and (d)(2).

## II.  The Prosecution Violated Mr. Tate's Rights to Due Process and a Reliable Sentencing Under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by Advancing a Materially Misleading and Factually Insupportable Argument that Nick Tate Killed Katelyn Williams. Counsel Were Constitutionally Ineffective for Failing to Counter These Misleading Arguments at Trial and Raise Them on Appeal

The constitutional prohibition against cruel and unusual punishment requires that a capital trial and sentencing be fair and reliable. *See e.g.*, *Gardner v. Florida*, 430 U.S. 349 (1977); *Woodson v. North Carolina*, 428 U.S. 280 (1976). A death sentence predicated in part on evidence which is

104

materially inaccurate violates due process and the prohibition against cruel and unusual punishments. *See Johnson v. Mississippi*, 403 U.S. 212 (1971); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993).

After having obtained convictions of Nick's brothers, Chad and Dustin, based on a set of facts wherein Chad impulsively and independently killed Katelyn , the prosecutor then advanced a diametrically opposite representation of facts in Nick's sentencing – arguing that Nick murdered Katelyn – in order to obtain a death sentence from a different judge.

### A.     The prosecutor's presentation of inherently factually contradictory theories

### 1.     To secure Chad 's conviction for the murder of Katelyn the prosecutor relied on evidence and facts supported by consistent, credible accounts from all defendants

All three co-defendants consistently described a chaotic, drug addled crime scene in which 15-year-old Chad, impulsively, strangled Katelyn and then cut her throat in an effort to "get her to quiet down so she [would] stop screaming." D.74-37:105. [76]   At Chad's plea in November 2002, the prosecutor recounted how, in the chaos that ensued as the brothers began ransacking the Williams home, Katelyn was crying and becoming "increasingly a nuisance."  D.74-37:88-89.  The brothers initially put duct

---

[76]     *See* D.74-37:24-26 (Dustin Tate custodial statement); D.74-37:105-07 (Chad Tate plea); *Id*. at 137-38 (Chad Tate pre-plea statement); Id. at 218-21 (Nicholas Tate custodial statement).

tape on Katelyn's mouth to quiet her but they took it off when she struggled so as not to hurt her.  *Id.* at 87.  Nick then told Chad to take Katelyn to the children's bedroom to "get her to be quiet," *Id.* at 89, while he searched for drugs.  *See*, *e.g.*, D.74-37:145, 155, 168.

According to both Chad and Dustin, Nick was terrified and panicked to discover that Chad had killed Katelyn after the fact. See D.74-37:110, 28-29.

> **2.    At Nick's sentencing, the prosecutor adopted a diametrically opposite factual theory before a different judge in order to secure a death sentence**

At Nick's sentencing, the State admitted its strategy was to change its theory and argue Nick, not Chad, killed Katelyn because the child's death was the only element that justified a death penalty case. "Everyone in this courtroom knows if [Chrissie Williams was] what the detectives found…we wouldn't be here arguing for the death penalty." D.64-12:77. "Everybody knows what makes this a death penalty case is this picture, this victim [Katelyn]." *Id.* at 78. "[I]f he's going to get the death penalty, he's got to be connected to the murder of Katelyn." *Id.* at 78-79 (emphasis added). Despite having twice related to Judge Foster that Chad murdered Katelyn, the State gave a wholly different version to Judge Beavers. With no evidence, the prosecutor argued that Nick (and, for that matter, Chad and Dustin) had been lying all along, and that Nick carried out Katelyn's

106

murder and blamed it on Chad. The prosecutor went so far as to *invent statements and attribute* them to Nick:

> He took that knife in there. He cut that baby's throat, once again saying "damn it. I asked you to do this. You can't do it. I'll take care of it."

D.64-12:80, 83, 85.

The prosecutor then misrepresented the physical evidence, arguing, falsely, that blood was only found on Nick's pants and that no blood was found on Chad's pants, D.64-12:85, misstatements which he only partially corrected much later when he noted that two pairs of jeans had blood on them. D64-12:90.[77]

### 3. The prosecutor's theory of the case, up until the moment of Nick's sentencing, was that Chad alone killed Katelyn

#### a. Chad's guilty plea

Chad's plea transcript shows how the State established that Chad made an independent decision to kill the child. Describing the immediate moments after Katelyn was killed, the prosecutor explained, "Nick comes in, *sees what's been done to Katelyn*, and he apparently tells Dustin just get out of here… (emphasis added)." D.74-37:90. Later, he told the court he had "covered each and every factual basis in this case," D.74-37:92, including

---

[77]   He never corrected the misstatement that no blood was found on Chad's pants.

"facts to support…the murder of young Katelyn with the knife—I believe that I have adequately described facts to support that."

> Chad told the court how he killed Katelyn:

> [Chad]: Well, I had shut the door and I had went over there – I started helping Nick, you know, look for drugs, and she kept on. And I had grabbed a piece of phone wire that I had cut to keep them from calling out of the place and I went back there and I strangled her.

> The Court: Put it around her neck and –

> [Chad]: Yes, sir.

> The Court: Did that stop her from screaming?

> [Chad]: For a while, sir. After I had finished strangling her, I went out of the room, had dropped the cord, and I continued to help Nick, and then I heard screaming again and –

> The Court: Nick's still looking for drugs.

> [Chad]: Yeah. I had ran back into the bedroom where she was and she was alive. I panicked. You know, I was terrified and I ran over to Nick and I grabbed the knife off of his holster.

D.77-37:106-107. Chad then described when Nick learned Chad had killed Katelyn:

> [Chad]: … And Nick had opened up the door 'cause the screaming had completely stopped. He opened up the door and he seen what I had done.

> The Court: Into the bedroom where Katelyn was?

108

> [Chad]: Chris – Yeah, Katelyn. And so did Dustin, and Dustin
> and Nick was terrified and they panicked and Nick told Dustin
> to get in the truck, go get in the truck, we're – we're going, you
> know.

D.74-37:110. At no point during or after Chad's colloquy did the State

correct the court's understanding or mention that it did not believe Chad's

statements. *Id.*

### b.    Dustin's guilty plea

The State added no new facts and cast no new doubt on Chad's

statement during Dustin's plea three days later. D.74-36:272-298. The state

again averred that Nick told Chad to quiet an "hysterical" Katelyn while

Nick searched the house for drugs and currency. Chad took the child into

another room and attempted to strangle her with a telephone cord, then

resumed helping Nick search. D.74-36:275-76.  According to the prosecutor:

"[i]n a few moments Katelyn began to revive and began crying and

whimpering again, so Chad then borrowed a knife from [Nick], went in

and cut the three-year-old's throat," D.74-36:276, Judge Foster then asked

Dustin a series of clarifying questions.

> The Court:  When did you first realize what Chad had done in
> the bedroom with the kids?
>
> [Dustin]: When I had walked out and I had spoken with Nick.
> Me and Nick were speaking in the front room…and Chad came
> out of the bedroom with a telephone cord wrapped around his
> hands, and I thought the child was dead at that time.

D.74-36:289-290.  Dustin saw Chad take the knife from Nick:

109

The Court: Where was the knife that Chad had used in –

[Dustin]: The knife was on Nick at that time.

The Court: All right. Did you see Chad take the knife from Nick?

[Dustin]: Yes, sir, I did.

The Court: And where did he go with it?

[Dustin]: He went to the bedroom.

The Court: *Did he say what he was going to do with it?*

[Dustin]: *No, sir.* I assumed it was to cut telephone wires...

The Court: … All right. Did he ask Nick to borrow the knife or did he just take it?

[Dustin]: He asked him. He said, give me your knife.

The Court: *Did he say why he wanted it?*

[Dustin]: *No, sir. He didn't.*

D.74-36:292-293 (emphasis added).

### B.    The prosecutor's use of inconsistent and incompatible theories of culpability to secure a death sentence violated Mr. Tate's right to due process

Prosecutors are responsible for ensuring fairness and integrity in the

legal process. Supreme Court precedent dating back over a century holds

110

that improper argument by a prosecutor can be "prejudicial to the accused," *Dunlop v. United States*, 165 U.S. 486, 498 (1897), and subsequent decisions have established clear guidance defining what prosecutors may or may not argue and how courts should assess prejudice from improper arguments. The Supreme Court has not expressly held that the use of inconsistent theories at the sentencing phase violates due process. However, "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court," and the Supreme Court has "several times before held that prosecutors' prejudicial or misleading statements violate due process if they render a trial or capital sentencing fundamentally unfair." *Andrew v. White*, 145 S.Ct. at 81, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, (1974), *Caldwell v. Mississippi*, 472 U.S. 320, 338-340 (1985), and *Darden v. Wainwright*, 477 U.S. 168, 178-183 (1986).

In *Darden,* the Supreme Court reviewed the prosecution's closing argument in a death penalty case, at the guilt-innocence phase. The prosecutor's comments were "undoubtedly" improper, 477 U.S. at 180, but the Court found that these improper comments did not deprive the defendant of a fair trial, in part because of overwhelming evidence of guilt. *Id.* at 182. The Court differentiated *Darden* from *Caldwell v. Mississippi*, 472 U.S. 320 (1985), where the Court found the prosecutor's penalty phase argument so prejudicial as to warrant reversal of petitioner's death sentence.

111

The use of irreconcilable prosecutorial arguments "reduce[s] criminal trials to mere gamesmanship and rob[s] them of their supposed purpose of a search for truth." *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J. concurring)(because the prosecutor could not believe that each of the irreconcilable theories he presented was true, the prosecutor's presentation "rendered [defendant's] trial fundamentally unfair"). *Id*. *See also Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997)(en banc), *rev'd on other grounds sub nomine Calderon v. Thompson*, 523 U.S. 538 (1998), (prosecutorial flip-flopping may violate due process, as "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime."); *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000), (using "inherently factually contradictory theories" to secure convictions against multiple defendants "violates the principles of due process").

This is exactly what happened here. The prosecutor used "inherently factually contradictory theories and changed the color of its stripes from one trial to the next by advancing an inconsistency … at the core of the prosecutor's separate cases against defendants for the same crime." *United States v. Hill*, 643 F.3d 807, 834 (11th Cir. 2011).

112

**C.    The state court's and the district court's analyses of cause and prejudice to excuse procedural default were flawed and relief is merited**

    **1.    Trial counsel preserved Mr. Tate's due process claim by filing the motion in limine**

Trial counsel filed a pretrial motion to ensure that the prosecution did not attempt to do exactly what it ultimately did. *See* Motion No. 6, "Motion to Preclude Prosecution from Changing Horses in Midstream." D.55-4:68-73. Counsel argued that: "An example of the D.A.'s changing horses in midstream would be if, when Nick gets on his trial, they argue to the jury that it was, in fact, Nick that killed the child." D.61-6:42. The prosecutor responded that the state sought "to go wherever the truth goes in this case," *id*. at 43. Defense counsel, presciently predicting the state's argument, countered with: "What if he calls Dustin and *the story stays the same*, but then we get to closing argument, and [the D.A.] says, 'You know, Ladies and Gentlemen, you don't have to believe what Dustin has said. Use your common sense. *Don't you think that it was actually Nick that killed this child*. … That's what we're talking about changing horses in midstream." *Id*. at 44. The court denied the motion. *Id*.

In Georgia, when trial counsel objects to an opposing party's anticipated argument by filing a motion in limine, the issue is preserved for appeal. *Tollette v. State*, 621 S.E.2d 742, 747 (Ga. 2005); *see also Carruthers v. State*, 528 S.E. 2d 217, 222 (Ga. 2000), *overruled on other grounds by Vergara v. State*, 657 S.E. 2d 863, 866 (Ga. 2008).

2.    **The state court based its analysis of appellate counsel's performance on a flawed factual finding and an incorrect standard of review on appeal**

Though the issue was clearly preserved at trial through the filing of the motion *in limine*, appellate counsel did not raise it on direct appeal, thereby defaulting a meritorious claim.

The state habeas court did not address the merits of the claim, ruling that the majority of the claim was procedurally defaulted. D.96-1:7, 8. The habeas court also improperly addressed appellate counsel's ineffectiveness by concluding that appellate counsel "could not have raised these issues on direct appeal." *Id.* at 57-58.[78]

The Georgia Supreme Court deferred to the habeas court's procedural default of the due process claim. It acknowledged that the habeas court did not address counsel's ineffectiveness for failure to object to the state's arguments at trial and raise the issue on appeal. But it found this did not matter because "assuming that Tate had a due process right to prevent the prosecution from pursuing inconsistent theories," the claim

---

[78]    Because the habeas court said nothing more on this portion of the claim, the basis for finding that appellate counsel "could not have raised this claim on direct appeal" is unclear but the only logical conclusion, and the one adopted by the Georgia Supreme Court, is that the habeas court believed – incorrectly - that trial counsel had failed to preserve the issue. *See id*; *Tate* at 230.

114

was not meritorious so there could be no cause and prejudice from counsel's dereliction. *Tate* at 230.[79]

The state supreme court was wrong as a matter of law and fact. The court incorrectly analyzed the claim using the *Strickland* standard. *Tate* at 230.[80] But where, as here, defense counsel *does* preserve an objection to an improper argument, the standard to obtain relief is considerably lower. In *Carruthers*, the Georgia Supreme Court articulated the difference: "…the standard of review in this case is not whether the improper argument in reasonable probability changed the result of the trial, *but simply whether the argument was objectionable and prejudicial*. *Carruthers*, 528 S.E. 2d at 222 (emphasis added). [81]

---

[79]   The District Court found that the Georgia Supreme Court's opinion was entitled to deference under § 2254(d). D.118:46-49.

[80]   The standard the court used is the equivalent of the *Darden* "fundamental fairness" standard.  *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir. 1988) (citing *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985)(citations to later proceedings omitted)

[81]   No Georgia case precisely defines *Carruthers'* "objectionable and prejudicial" standard; however, we can deduce its meaning from *Todd v. State*: "[w]hen no timely objection is interposed, the test for reversible error is not simply whether the argument is objectionable, or even if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed the result of the trial." *Todd v. State*, 410 S.E. 2d 725, 728 (Ga. 1991), *citing Ford v. State*, 255 Ga. at 90.

115

Had appellate counsel performed effectively and raised the due process claim on direct appeal, they would have had to meet only the lower "objectionable and prejudicial" standard to obtain relief. The Georgia Supreme Court's (and the District Court's)[82] endorsement of the state habeas court's analysis on this point was flawed because it was based on a clearly erroneous finding that defense counsel did not preserve an objection on this issue.

**D.** **The state court's finding that "the state never adopted as its theory Chad's version of how Katelyn's murder occurred" is based on an unreasonable determination of the facts in light of the evidence**

After determining that the habeas court correctly found that the claim was procedurally defaulted, the Georgia Supreme Court proceeded to find the underlying claim meritless because "the State never adopted as its theory Chad Tate's version of how Katelyn Williams's murder occurred, but instead proceeded under the theory that the evidence did not conclusively show who actually performed the physical act of taking Katelyn Williams' life." *Tate,* 835 S.E. 2d at 230-231. But it was not until Nick's sentencing that the State for the first time "proceeded under the theory that the evidence did not conclusively show"[83] what happened to Katelyn when it remarked "there's evidence that may suggest this [the fact

---

[82]     *Tate*, 835 S.E. 2d at 230; D.118:42-45.

[83]     *Tate* at 230.

that Chad killed Katelyn] is not necessarily what happened,"[84] and "the physical evidence did not indicate who actually performed the act."[85]

The state supreme court relied heavily on the State's use of two qualifying phrases during Chad's plea colloquy in reaching this finding.

> '[S]o [Chad Tate] borrows – he asks – or takes – the knife…back into the bedroom where Katelyn is coming to and reviving, turns her over onto her face, puts a pillow over her, *according to his version*, and cuts her from ear to ear.' (Emphasis supplied.) Later the prosecutor stated:
>
>> [B]the way, [Tate]…said actually on the [videotape of his custodial interview], I gave that child every chance to shut up, but she wouldn't shut up. *His version* is that Chad comes out after choking [sic] with the telephone cord and asks for his knife, whereupon he reaches and hands him the knife. Chad says he simply got the knife out of his sheath – out of his holster.

*Id.* at 230-231 (emphasis in original).

The supreme court's emphasis on the prosecutor's use of "his version" ignores the wider context of the State's theory offered at Chad's and Dustin's sentencings and is factually inaccurate. The "his version"

---

[84]    D.64-7:60.

[85]    *Tate*, 835 S.E. 2d at 231.  Twice prior, the State told Judge Foster that Chad committed the physical act and offered no evidence to the contrary. If the prosecutor believed Nick killed Katelyn in November 2002, then an officer of the court twice misrepresented a critical fact and twice stood silently while Chad and Dustin lied under oath.

117

reference to Chad's statement is to detail given by Chad about how the killing occurred, not about who killed Katelyn. It does not mean the State did not "adopt [the] theory" that it was Chad who killed the child.

The "his version" reference to what Nick allegedly said is simply incorrect and not supported by the record. The only thing Nick said in his custodial statement about giving the knife to Chad is that Chad asked for it when Nick walked in the front door. "And he went to the back. I, I guess he cut all the back lines with it." D.74-37:230. Nick said nothing about giving the knife to Chad after Chad has choked Katelyn.

Where a state court's "critical factual determinations" are inconsistent with the record, they are therefore unreasonable under § 2254(d)(2). *Brumfield,*, 576 U.S. at 313-14. "Deference does not imply abandonment or abdication of judicial review." *Sears v. Warden, GCDP*, 73 F.4th 1269, 1279-81 (11th Cir. 2023) *quoting Miller-El,* 537 U.S. 322 (2003) at 340.

In *Sears* this Court granted relief in part because the Georgia Supreme Court's "cursory" decision on the claim at issue was based on an unreasonable determination of the facts in light of the evidence presented. 73 F. 4th at 1287. Because the Georgia Supreme Court "cherry-picked facts from the record that distorted the picture of the underlying proceedings," *id.* at 1288, this Court concluded that Sears showed by clear and convincing evidence that the Georgia Supreme Court's "failure to consider the full record resulted in an unreasonable determination of the facts" under

118

§ 2254(d)(2). *Id.* at 1289.

Similarly, the court here focused on the prosecutor's use of the phrase "his version" during Chad's plea, while ignoring the state's actual theory proffered directly to Judge Foster and endorsed during judicial questioning of Chad and Dustin. The record below belies the conclusion that the State never adopted a single theory of culpability, and the state supreme court's "failure to consider the full record resulted in an unreasonable determination of the facts" under § 2254(d)(2). *Id*.

## E.     By any standard, petitioner suffered prejudice and de novo review is proper

The prosecutor's argument at the sentencing phase was clearly an improper violation of due process. Judge Beavers was new to the case; he did not observe Chad's and Dustin's plea colloquies so was not privy to the details provided by either about the crime. The argument was not inadvertent: the prosecutor deliberately pressed the false picture that Nick killed the child after admitting that he needed to tie Nick to Katelyn's murder to obtain the death penalty. He invented the scenario of Nick cutting Katelyn's throat, complete with imaginary dialogue. By putting words in Nick's mouth, he "manipulated" and "misstate[d] the evidence" at trial. *Darden*, 477 U.S. at 168. He also allowed Major Goble, the lead

detective, to testify that only Nick's pair of pants had blood on them, failing to correct him.  D.64-10:94.[86]

The "inherently factually contradictory theories" promoted by the prosecutor are exactly what counsel filed the motion in limine to prevent, and are exactly what was condemned in *Drake v. Kemp*, 762 F.2d at 1479. This argument was properly preserved, objectionable, and contributed to the verdict, thereby meeting the *Carruthers* standard.  Even under the higher "fundamental fairness" standard of *Darden*, Petitioner has shown prejudice.

Appellate counsel's failure to raise the claim constitutes cause and prejudice to excuse the procedural default of this claim.  *De novo* review, and relief, are required.

> **F.    Trial counsel was prejudicially deficient for failing to meaningfully challenge the prosecutor's argument as false and misleading or to articulate the illegality of such argument under clearly established Supreme Court and related precedent**

---

[86]    Prosecutors have a duty to correct false testimony, or testimony that creates a false impression, presented at trial.  *Giglio v. United States,* 405 U.S. 150, 153-54 (1972); *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).  Misleading statements made by a prosecutor which have a material impact on the jury's deliberations are as much in violation of the dictates of *Giglio* and *Napue* as outright perjury.  *See, e.g., United States v. Bagley*, 473 U.S. 667, 684 (1985)(condemning "technically correct" but misleading information provided by prosecution).

Beyond the failed motion in limine and bare assertions in argument that there was no evidence to support that Nick killed Katelyn, counsel did not counter the State's false narrative. D.64-12:104-208. Counsel inexplicably failed to proffer the transcripts of Chad's pre-plea interview and the plea colloquies of either Chad or Dustin or to call either to testify and provide credible, tangible evidence that Chad, not Nick, killed Katelyn.

The details from those transcripts would have confirmed that Chad was the killer of Katelyn and that no one had ever said differently. They also would have shown that Chad was permitted to enter an *Alford* plea to both the charges of child molestation and to the charge of Chrissie's killing because he maintained that Chrissie's killing was accidental and that there had been no sexual molestation, D.74-37:81, 123, 127, facts that were relevant to Nick's culpability. Perhaps most importantly, they would have illustrated the conviction with which the prosecutor advanced his consistent theory that Chad alone killed Katelyn.

The Georgia Supreme Court found that counsel did not present the testimony of Chad or Dustin because "Tate did not want either of his brothers testifying," *Tate* at 424, but the record shows counsel had no reason and gave no reason for not calling the brothers. D.74-32:120, 125-26. It was not because Petitioner did not want them presented. *Id*.; D.74-33:80 (testimony of Reed) D.74-32:201-205 (testimony of Chad) D.74-32:173 (testimony of Dustin).

121

The Georgia Supreme Court also claimed that counsel "could have considered it sound trial strategy" not to present Chad's custodial interview and both brothers' plea colloquies, because they "contained inconsistent statements that could have been considered contrary to trial counsel's strategy to refute the State's argument that Tate was the leader of the group, and statements that were in other ways unfavorable to Tate." *Tate* at 424. But the court cannot point to any actual inconsistencies in the transcripts or statements that were in any way unfavorable to Nick.

No reasonable counsel would forego presenting evidence that their client was not responsible for killing the child in a case where the *prosecutor* argued that was the one necessary factor for death eligibility.

**G.    The prohibition against cruel and unusual punishment imposed by the United States Constitution protects Mr. Tate from arbitrary, capricious, or mistaken administration of the death penalty**

The prosecutor's argument here epitomizes arbitrariness. Relative culpability is critical in the penalty phase of a capital case, *Green v. Georgia*, 442 U.S. 95, 97 (1979) (whether defendant was present at the time of the actual murder was "highly relevant to a critical issue in the punishment phase of the trial"). The conclusion that a defendant did, in fact, commit the murder in question increases his or her culpability and thus the likelihood of a death sentence.

Accurate sentencing information is an "indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," *Gregg v.*

*Georgia*, 428 U.S. 153, 190 (1976).  The death sentence here is therefore fundamentally unreliable and contrary to the prohibition on cruel and unusual punishment imposed by the Eighth Amendment to the United States Constitution and Article I, § 1, ¶ 17 of the Georgia Constitution.  *See*, *e.g.*, *Johnson v. Mississippi*, 486 U.S. 578, 586-87 (1988)(death sentence based on inaccurate information found unreliable); *Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (vacating death sentence where procedure created unacceptable risk of unreliable conviction).

### III. Counsel Were Prejudicially Ineffective for Misleading Nick into Waiving His Sixth Amendment Right to a Jury Trial

Nick Tate, a brain-damaged defendant who had experienced a fundamentalist religious conversion, believed he had committed a crime "worthy of death." He pleaded guilty to expose himself to a possible death sentence.  His attorneys, neither from Paulding County, relied on what they "heard around the courthouse" about the judge to press their client into waiving his right to a jury trial.  They told Nick that he had a better chance of getting the death penalty after a bench trial but they believed the opposite—that the judge was more likely to give life.  However they had no assurances the judge would render a life sentence.  Under these

circumstances, waiving their client's right to a jury trial in a capital case was prejudicially unreasonable.[87]

A defendant may waive his fundamental right to a trial and be tried by a court, but "whether or not there is an intelligent, competent, self protecting waiver of jury trial [] must depend upon the unique circumstances of each case," *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942), and "waiving a jury trial is a decision that must be made by the defendant personally; it is not a tactical decision that his lawyer can make for him." *United States v. Shamsid-Deen*, 61 F.4th 935, 951 (11th Cir. 2023), citing *United States v. Spiegel*, 604 F.2d 961, 965 n.9 (5th Cir. 1979)( "counsel may [not] waive the right to a jury trial for their clients").

### A. Counsel "outsmarted" Nick into waiving a jury

It was not Nick's idea to waive a jury trial on sentencing. Counsel testified he talked Nick into a bench trial because "everybody who knew Judge Beavers told me that he was unlikely to give the death penalty." D.81-1:51.

There is no question counsel misled his client. "I thought I was outsmarting him." D.74-32:104. Asked if Nick wanted to waive the jury trial, Cella answered, "After I talked to him, yes, he did." D.74-32:104.

---

[87]    The habeas court addressed this claim on the merits, D.96-1:20, and the state supreme court affirmed. *Tate* at 227. The district court affirmed the state court under § 2254.

124

This was unreasonable conduct, which Cella acknowledged. "I thought it seemed good and I thought it would result in saving his life. I was wrong about that. The judge surprised me; maybe not my client but he surprised me with the death sentence." D.81-1:51.

Reed testified:

> I think that there was a reliance on our part that Judge Beavers was the presiding judge and did not expect the death penalty to be issued. So that, I think, maybe [we] relied too much on that."

D.81-1:11 They "were convinced [the judge] would return a life sentence." D.74-35:36.

### B.    "Strategy" based on leniency rumors was unreasonable

An "attorney's choice of tactic must be *reasonable* under the circumstances." *Cave v. Singletary*, 971 F.2d 1513, 1518 (11th Cir. 1992)(emphasis in original). The state supreme court described at length Cella's "strategic reasons" for advising his client to waive a jury trial, *Tate* at 227-28, and credited his "strategy," that "every single person [he] talked to that knew the judge, including the people in the DA's office, told [him] that they didn't believe the judge would give the death penalty." *Tate* at 227.

It then quoted Reed as testifying similarly, but Reed did not even recognize there *was* a strategy. D.81-1:122.

> I don't remember the strategy behind that accept (sic)…I think Mark really thought that the judge was already leaning towards a life sentence anyways. To me it's easier to convince one person

125

out of twelve than it is to convince one person period.  So I don't know what the strategy…was on that.

D.81-1:122.

Even so, because Cella had no experience with the judge and was admittedly relying on courthouse small talk, the court puffs up Reed's actual knowledge of the judge.  *See* D.81-1:123-124. Reed had appeared before Judge Beavers but his "personal experience" with the judge was far less than the state supreme court claimed.  According to Reed, all he knew was the judge "would tend to be a little more open to say probated cases versus jail cases."  He was "not an angry judge…maybe around the courthouse there was conversation that he's not going to find death penalty in this case." See D.81-1:123-24.

The state supreme court exaggerated Reed's testimony.   It claimed Reed found the judge "exceptionally 'fair' and 'open-minded.'"  *Tate* at 227.  What Reed actually said was "I found that he, *maybe being more fair – open-minded* than say other judges … just [in] my experience." D.81-1:123.  "Exceptionally" fair is a big exaggeration of "maybe being more" fair.  And Reed did not say he "thought that [the judge] was 'already leaning towards a life sentence.'"  *Tate* at 227.  He said Cella thought that.  D.81-1:122.

### C.    Counsel ignored their client's experience with the judge

According to the state court, the decision to waive a jury trial was reasonable because after three weeks of questioning, not enough jurors

126

who could consider a life sentence could be qualified. [88]   Cella "took advantage of that three weeks to talk to Nick about waiving his right to a jury trial," D.74-32:103, by telling him the judge would be more likely than a jury to impose death.  *Tate* at 227.

Counsel should have paid attention to why his client was amenable to a bench trial.  Unlike counsel, Nick did have experience with Judge Beavers – Beavers had been the judge who, in 1993, signed his 30-day mental health commitment and refused Nick's request made halfway through the hospitalization to allow him to be discharged and go home. D.74-36:214-15. [89]   At his plea, Nick lauded this decision and believed the judge "would give the appropriate sentence."  *Id.*  The state court cites this as supporting the reasonableness of counsel's decision, *Tate* at 227, but it shows the opposite.  Nick's experience with the judge was that he was harsh, which is why Nick believed the judge might sentence him to death. Counsel's obliviousness to this even as he believed he was "outsmarting"

---

[88]     According to Reed, many jurors were struck for cause who "probably should not have been;" he believed the judge's excusal of jurors who were barely hesitant about considering a life sentence was why the voir dire process was so lengthy.  Reed was "sure [counsel] could have picked a jury which would have been unable to give the death penalty."  D.74-35:34.   The state supreme court omits mention of this.

[89]     The judge never gave any sign he remembered Mr. Tate from 1993.

Nick with a bench trial was deficient representation.  As Cella testified, the death sentence surprised him, but "maybe not my client."[90]

### D. Under the "unique circumstances" of this case, the waiver could not be "intelligent, competent and self-protecting"[91]

The plea colloquy shows that the trial court had previously agreed with counsel, off the record, to allow Nick to waive his right to a jury trial. *See* D.74-36:193-94.  If the judge made statements or gave assurances that caused counsel to believe he would deliver a life sentence, those assurances should have been part of the record.  If he could not make such assurances, a reasonable judge in the same position would not have agreed to be the sole decisionmaker in a capital case where counsel's interest and that of his client did not entirely align.  *See Summerlin v. Stewart*, 341 F.3d 1082, 1114 (9th Cir. 2003)(discussing the potential problems "when a capital decision is reposed in a single decision-maker who may be habituated to the process, or who may not treat capital sentencing in accordance with the heightened

---

[90]    The district court also deferred to counsel's strategy, despite finding that the state supreme court "may have exaggerated co-counsel's and Petitioner's testimony."  D.118:67.  It claimed counsel had to consider that Nick was "limiting his ability to present a robust case in mitigation, and the trial judge would have had, at the least, an inkling about that given his in-court discussions with Petitioner."  *Id*. There is no mention of limiting mitigation in any discussions with the court, and as shown, Nick never limited mitigation outside of presenting Curtis and his mother.

[91]    *Adams*, 317 U.S. at 278.

requirements that the Eighth Amendment imposes."). *See also Duncan v. Louisiana,* 391 U.S. 145, 155-56(1968)("[T]he right to be tried by a jury g[ives a defendant] an inestimable safeguard against the corrupt or overzealous prosecutor and against the *compliant, biased or eccentric* judge.")(emphasis added); *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938)(courts must "indulge in every reasonable presumption against waiver").

Cella testified he had reviewed Nick's rights with him. D.74-32:102, but that does not negate the fact Nick would not have waived his right to a jury but for counsel's misrepresentations.[92]  Under the bizarre circumstances here, counsel's successful efforts to deceive Nick could not result in a knowing and intelligent waiver.

Additionally, the standard for competency to plead guilty and for waiving a jury trial – a rational and factual understanding -- are the same. *Godinez v. Moran*, 509 U.S. 389, 401 (1993); *Brady v. United States*, 397 U.S. 742, 748 (1970)(waiver of jury trial must be "knowing and intelligent"). Reed testified below that he had doubts about whether Nick's guilty plea was freely and voluntarily entered and *did not know* if Nick "understood the consequences of pleading guilty." D.81-1:109-110.  Dr. Richards, who evaluated Nick for trial competency and to plead guilty, testified that if he had been furnished the evidence presented in the habeas proceedings, "it

---

[92]    Reed did not recall ever discussing with Petitioner the waiving of his Sixth and Fourteenth Amendment rights to a jury trial.

would have affected my conclusion that he was competent to [plead guilty to capital murder] without...a negotiated plea." D.81-3:246.

Nick, while stating he had committed a crime worthy of death, was ready to accept any verdict. *See* D.74-36:141-42; D.74-34:212, D.74-36:141-42. He would have had a jury trial had counsel not acted unreasonably and talked him into the bench trial, and "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins,* 539 U.S. at 537. Nick was prejudiced by counsel's deficient performance. The state supreme court unreasonably determined the facts surrounding counsel's decision, § 2254(d)(2), and relief is appropriate.

## CONCLUSION

For each of the foregoing reasons, the decision of the district court should be reversed.

EMILY GILBERT
Counsel for Nicholas Cody Tate

**CERTIFICATE OF COMPLIANCE AND SERVICE**

This is to certify that the foregoing motion is in compliance with

Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(a)(5), (6) because

it includes 29,718 words and has been prepared in Book Antiqua 14 point, a

proportionally-spaced typeface, using the Microsoft Word 365 word

processing software. Moreover, on the date set forth below, counsel

uploaded this motion and certificate to the Court's ECF e-filing system,

which promptly served opposing counsel:

> SABRINA GRAHAM
> sgraham@law.ga.gov
> Attorney General's Office
> 40 Capitol Square, SW
> Atlanta, GA 30334

May 13, 2025.

> EMILY GILBERT
> Federal Defender Program, Inc.
> 101 Marietta St., NW, Suite 1500
> Atlanta, GA 30303
>
> Counsel for Nicholas Cody Tate

131